Byron DURAN, Petitioner,

v.

The INDUSTRIAL CLAIM APPEALS OF-
FICE OF the STATE OF COLORADO,
Curtice Burns Meat Snacks, Inc., and
Lumbermans Mutual Casualty Compa-
ny, Respondents.

Felipe URBINA, Petitioner,

v.

The INDUSTRIAL CLAIM APPEALS OF-
FICE OF the STATE OF COLORADO,
South Valley Dry Wall, and Truck In-
surance Exchange, Respondents.

Nos. 93SC497, 93SC655.

Supreme Court of Colorado,
En Banc.

Oct. 17, 1994.

Rehearing Denied Nov. 7, 1994.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Pepe J. Mendez & Associates, P.C., Pepe J. Mendez, Denver, for petitioner.

White and Steele, P.C., John Lebsack, Ted A. Krumreich, Denver, for respondents Curtice Burns Meat Snacks, Inc. and Lumbermans Mut. Cas. Co.

Hall & Evans, L.L.C., Alan Epstein, Denver, for respondents South Valley Dry Wall and Truck Ins. Exchange.

David R. DeMuro, P.C., David R. DeMuro, Law Offices of Robert Weinberger, P.C., Thomas L. Kanan, Jr., Michael J. Steiner, Denver, for amicus curiae Colo. Compensation Ins. Authority.

Plaut, Lipstein, Mortimer, P.C., Frank Plaut, Charles E. Mortimer, Jr., Lakewood, Berry & Singer, John Berry, Denver, for amicus curiae Workers' Comp. Coalition.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., James C. Klein, Asst. Atty. Gen., Human Resources Section, Denver, for amicus curiae Dept. of Labor and Employment, Div. of Workers' Comp. and Director of Div. of Workers' Comp.

Wilcox & Ogden, Ralph Ogden, Turner & Meiklejohn, P.C., Robert Turner, Scott Meiklejohn, Denver, for amici curiae Colo. AFL–CIO and the Workers' Comp. Educ. Ass'n.

Chief Justice ROVIRA delivered the Opinion of the Court.

The question presented in these consolidated workers' compensation cases is whether the Workers' Compensation Act of Colorado, sections 8–42–101 to 8–47–209, 3B C.R.S. (1994 Supp.) (the Act) violates equal protec-

tion of the laws under the federal and state constitutions by establishing two different methods for calculating an award of benefits: one based on a rating schedule applicable to injuries resulting in the partial loss or loss of use of extremities (hands, arms, feet and legs) and the other based on a medical impairment rating applicable to injuries resulting in the total loss or loss of use of extremities and injuries to the torso and head. We uphold the constitutionality of the statutes.

## I

## Background

The Act establishes the benefits scheme for workers injured in the course and scope of employment and the procedures for obtaining those benefits. The legislative purpose of the Act appears in section 8–40–102:

> **Legislative declaration.** (1) It is the intent of the general assembly that the "Workers' Compensation Act of Colorado" be interpreted so as to assure the quick and efficient delivery of disability and medical benefits to injured workers at a reasonable cost to employers, without the necessity of any litigation, recognizing that the workers' compensation system in Colorado is based on a mutual renunciation of common law rights and defenses by employers and employees alike.

The provisions of the Act which establish the framework for calculating permanent partial disability benefits are contained in section 8–42–107. Prior to 1991, that section provided that a worker who permanently injured his hand, arm, foot, or leg was entitled to a minimum award of permanent disability benefits set forth in section 8–51–104(7), even if the injury caused no actual disability. These minimum awards were known as "scheduled awards." If an injured worker suffered an actual loss of earning capacity greater than that provided in the schedule, the worker retained the right to seek a greater award based upon that loss. § 8–54–104(7), 3B C.R.S. (1990 Supp.). All permanent partial disability awards not based on the schedule

were based upon the worker's "industrial disability or loss of earning capacity in the labor market and not merely ... a physical impairment or functional disability unrelated to industrial performance." *Vail Associates, Inc. v. West,* 692 P.2d 1111, 1114 (Colo.1984) (citing *Byouk v. Industrial Comm'n,* 106 Colo. 430, 434, 105 P.2d 1087, 1089 (1940)). Such benefits were calculated in terms of the percentage of total disability and were determined by "taking into consideration ... the general physical condition and mental training, ability, former employment, and education of the injured employee." § 8–51–108(1)(b), 3B C.R.S. (1986). Under prior law, administrative law judges were given "wide discretion in determining the degree of [a claimant's] disability." *Gilliatt v. Industrial Comm'n,* 680 P.2d 1310, 1313 (Colo.App. 1983).

As amended,[1] the Act provides two distinct formulas for calculating partial permanent disability benefits. Section 8–42–107(2) retains the schedule system as the exclusive measure of benefits for partial loss or loss of use of a hand, arm, foot, leg, sight or hearing. The schedule establishes a fixed number of weeks to be multiplied by the statutory compensation rate of $150 which is to be multiplied by an "extremity impairment" rating, i.e., the extent to which a hand, for example, is not fully functional after an injury. Section 8–42–107(8), in contrast, provides that benefits for the total loss or loss of use of a hand, arm, foot, leg, or injuries to the torso or head are to be calculated pursuant to the American Medical Association *Guides to the Evaluation of Permanent Impairment* (Rev.3d ed. 1991), to determine the worker's permanent physical impairment rating. Under this formula, an injury to an extremity is calculated as a "whole body impairment" rating pursuant to tables contained in the American Medical Association's guide.

## II

### A. Duran

On July 27, 1991, Byron Duran (Duran) sustained an employment-related injury. As

---

**1.** In 1991, section 8–42–107 was comprehensively amended to provide for two separate methods of benefits calculation. S.B. 91–218, Ch. 219, sec. 15, 1991 Colo.Sess.Laws 1291, 1306 (S.B. 91–218).

he was operating a meat mixer for his employer, Curtice Burns Meat Snacks, Inc., Duran's left hand was caught in an auger conduit. He suffered an amputation of his left long finger distal phalanx and severe lacerations of the index and ring fingers. Subsequently, he developed Raynaud's Phenomenon, a cumulative trauma disorder characterized by recurrent episodes of finger blanching due to closure of the digital arteries, which gives rise to pain in the fingers when exposed to cold temperatures. The Raynaud's Phenomenon affects Duran's entire left arm.

On November 13, 1991, Duran returned to work for Curtice Burns. His job requires continuous, repetitive motion of his upper extremities and is performed in a room where the temperature is maintained at forty degrees.

Duran reached maximum medical improvement on April 28, 1992. Dr. Stephan D. Lindenbaum performed an independent medical evaluation of Duran's injury at the request of the Division of Workers' Compensation. Lindenbaum calculated a twenty-eight percent upper extremity impairment and an eighteen percent impairment as a whole person.

The Administrative Law Judge (ALJ) awarded Duran $8,736 in workers' compensation benefits based on the twenty-eight percent upper extremity rating. This award was calculated based on the scheduled list injuries to extremities listed in section 8–42–107(2).[2]

Duran appealed the ALJ's award of benefits to the Industrial Claim Appeals Panel (ICAP), arguing that the statutory formula applied by the ALJ mandated for partial injuries[3] denied him equal protection of the laws. His argument was based on the fact that his award of benefits would have been significantly higher ($31,352) had they been calculated as a total injury[4] and that the distinction drawn by the Act between partial and total injuries was arbitrary, capricious, and unreasonable.[5]

ICAP ruled that it lacked the authority to consider Duran's constitutional claim and thus, it affirmed the ALJ's order. Duran filed a petition for writ of certiorari with the

---

2. Section 8–42–107(7)(b), provides:

> Except as provided in subsection (8) of this section, where an injury causes the ... partial loss of use of any member specified in the foregoing schedule, the amount of permanent partial disability shall be the proportionate share of the amount stated in the above schedule for the total loss of a member, and such amount shall be in addition to compensation for temporary disability.

Subsections 8–42–107(2)(a) and (6) allow compensation for the loss of an arm at the shoulder for 208 weeks at the rate of $150 per week. Duran's impairment rating of the upper extremity was twenty-eight percent. Thus, his permanent partial disability award was calculated by multiplying 208 × $150 × .28, which equals $8,736.

3. Injuries for which compensation is calculated pursuant to section 8–42–107(2), i.e., those for the partial loss of or loss of use of arms, forearms, legs at the hip or knee, feet, and hands will be referred to as "partial injuries."

4. Injuries for which compensation is calculated pursuant to section 8–42–107(8) will be referred to as "total injuries."

5. Section 8–42–107(8)(d), which applies to non-scheduled injuries provides:

> Medical impairment benefits shall be determined by multiplying the medical impairment rating determined pursuant to paragraph (c) of this subsection (8) by the age factor determined pursuant to paragraph (e) of this subsection (8) and by four hundred weeks and shall be calculated at the temporary total disability rate specified in section 8–42–105.

Section 8–42–107(8)(c) provides:

> When the injured employee's date of maximum medical improvement has been determined pursuant to paragraph (b) of this subsection (8), the authorized treating physician shall determine a medical impairment rating as a percentage of the whole person based on the revised third edition of the "American Medical Association Guides to the Evaluation of Permanent Impairment," in effect as of July 1, 1991.

Duran reached maximum medical improvement on January 9, 1992, at the age of twenty-two. Thus, the age factor set forth in section 8–42–107(8)(e) is 1.74. Section 8–42–105(1) provides that the temporary total disability rate is "sixty-six and two-thirds percent of said employee's average weekly wages." Duran's average weekly wage was $357.37. Thus, his temporary total disability rate is $250.26. Duran's benefits calculated pursuant to section 8–42–107(8), an award of $31,352 is arrived at by multiplying the medical impairment rating of eighteen percent, or .18 × 400 × 1.74 × $250.26.

court of appeals pursuant to C.A.R. 26, which was denied.[6] Duran then petitioned this court for a writ of certiorari pursuant to C.A.R. 46.7, 49, and 52(b), which was granted.

## B. Urbina

On September 19, 1991, Felipe Urbina (Urbina) sustained an employment-related injury. He was standing on a mobile scaffold hanging sheet rock for his employer, South Valley Dry Wall, when he fell about six feet, landing on his back. He suffered acute cervical and lumbar strain and thoracic compression fractures as a result of the fall.

Urbina was unable to return to work as a drywaller, which frequently requires heavy lifting. He reached maximum medical improvement on March 27, 1992 at age 37.

Dr. Kasiel Steinhardt performed an independent medical examination at the request of the Division of Workers' Compensation. On the basis of permanent injury to Urbina's back, Steinhardt concluded that Urbina suffered a twelve percent impairment of the whole person. Urbina's employer-selected physician, Dr. Joan K. Szynal, assessed his permanent shoulder injury as an eight percent upper extremity impairment that is equivalent to a five percent whole person impairment rating.

The ALJ accepted Steinhardt's evaluation of Urbina's back injury at twelve percent impairment of a total injury, and awarded him $22,425.60 in benefits pursuant to section 8–42–107(8)(d). The ALJ also accepted Szynal's evaluation of Urbina's shoulder injury as an eight percent upper extremity impairment and awarded him an additional $2,496

pursuant to the partial injury schedule under section 8–42–107(2).[7]

Urbina appealed the ALJ's award of benefits to ICAP arguing, *inter alia*, that the statutory formula applied by the ALJ to determine the benefits to be awarded for his partial injury denied him equal protection of the laws. His argument was based on the fact that his award of benefits would have been significantly higher ($9,344) had they been calculated based on the formula applicable to total injuries and that the distinction drawn by the Act between partial and total injuries was arbitrary, capricious, and unreasonable.

After ruling that it did not have the authority to consider Urbina's constitutional claim, ICAP affirmed the ALJ's order. Urbina then petitioned the court of appeals for a writ of certiorari pursuant to C.A.R. 46, which was denied. Urbina petitioned this court for a writ of certiorari which was granted.

## III

■ Petitioners argue that as applied,[8] the different formulas for determining benefits for partial and total injuries violate their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and article II, section 5 of the Colorado Constitution. The threshold question in any equal protection challenge is whether the legislation results in dissimilar treatment of similarly situated individuals. *See, e.g., Western Metal v. Acoustical and Constr.*, 851 P.2d 875, 880 (Colo.1993). Petitioners argue that under the current legislative scheme, similarly situated persons are treated differently depending on which section of the statute is used to calculate their

---

6. The court of appeals denied the petition on the grounds that the court "previously has rejected an equal protection challenge to the former version of the statute providing for scheduled awards for certain injuries, now found at § 8–42–107, C.R.S. (1992 Cum.Supp.), *see Matthews v. Industrial Commission*, 44 Colo.App. 159, 627 P.2d 1123 (1980)." In addition, the court of appeals stated that "the court notes that this case lacks an evidentiary record regarding the constitutional issue raised."

7. This figure was reached by multiplying 208 × 150 × .08. *See supra* note 1.

8. At oral argument, petitioners explained that they do not raise a facial challenge to the constitutionality of this system because they recognize that in some cases, such as those involving part-time workers or elderly, low-wage workers, the schedule formula of section 8–42–107(2) may provide more generous benefits than the whole body impairment formula of section—107(8).

**482**

benefits.[9]

The parties do not dispute the appropriate standard which governs this case. Because the receipt of workers' compensation benefits is not a fundamental right, the rational basis test applies. *See Reynolds v. Industrial Claim Appeals Office,* 794 P.2d 1080 (Colo.App.1990); *Stark v. Zimmerman,* 638 P.2d 843 (Colo.App.1981); *see also Olson v. Public Serv. Co.,* 190 Colo. 512, 549 P.2d 780 (1976). Under that standard, a classification is presumed constitutional and does not violate equal protection unless it is proven, beyond a reasonable doubt, that the classification has no rational basis or is not rationally related to a legitimate governmental purpose. *See Colorado Soc'y of Community and Institutional Psychologists, Inc. v. Lamm,* 741 P.2d 707 (Colo.1987). We consider the two prongs of the rational basis test in turn, considering first whether there is "a rational basis in fact for the statutory classification." *Western Metal v. Acoustical and Constr.,* 851 P.2d 875, 881 (Colo.1993).

### A

Petitioners argue that there is no rational basis for distinguishing between an award of benefits for the partial loss of an extremity and an award of benefits for the total loss of an extremity. Specifically, that the "use of the schedule for partial injuries to upper extremities is arbitrary because partial injuries differ only in degree from total injuries." [10]

Initially, we recognize that an imperfectly drawn legislative distinction does not by itself result in denial of equal protection of the laws. For instance, in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court reviewed Maryland's welfare regulations which imposed a cap on benefits so that households of more than six persons received the same amount of benefits as did households with six persons. In upholding the Maryland scheme, the Court applied well-settled equal protection principles:

[A] State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because

---

**9.** The Act provides that similarly situated injured workers are entitled to different compensation based on the degree of their injuries. An argument exists however that the distinction between scheduled and nonscheduled injuries does not meet the threshold requirement of an equal protection challenge because an individual suffering from the partial loss of use of an extremity is not necessarily similarly situated with an individual suffering from complete loss of use of the extremity. *See Western Metal v. Acoustical and Constr.,* 851 P.2d 875, 880 (Colo.1993). In our view, this analysis requires too exacting a focus on the injury creating the classification. The Act provides for "quick and efficient delivery of disability and medical benefits to *injured workers* at a reasonable cost to employers...." § 8–40–1012(1) (emphasis supplied). As defined by the Act " 'accident', 'injury', or 'injuries' includes disability or death resulting from accident or occupational disease as defined in subsection (14) of this subsection." § 8–40–201(2), 3B C.R.S. (1994 Cum.Supp.). The statute therefore categorizes injured workers as a whole, whether the injury results in full or partial disability or even results in death. Thus, our analysis focuses on whether the disparate treatment of similarly situated workers suffering from partial or permanent disability is rationally related to a legitimate state interest.

**10.** As support for this contention, plaintiffs' posit the following hypothetical:

If a 37-year-old worker with a pre-injury income of $400 per week loses 100% of the use of his arm in an accident, such an injury is removed from the schedule by section 8–42–107(8)(c.5). Thus, such a worker would receive the amount provided by section 8–42–107(8) of the statute: this amount would equal 400 weeks × .60 "whole person" impairment rating under the AMA Guides × 1.46 age factor × .666 × $400, or $93,346.56.

However, if the identical worker loses 90% of the use of his arm, then he is thrust onto the schedule, and his actual whole person medical impairment under the AMA Guides becomes irrelevant. Such a worker receives only the scheduled amount of compensation for this injury—.90 × 208 weeks × $150 per week, or $28,080. Thus, a 10% difference in severity of injuries to an identical member yields a 300% reduction in compensation, under section 8–42–107's two-tiered system of injury evaluation. It is difficult to conceive of a rational purpose for reducing a person's compensation by *300%* because of a *10%* reduction in an injury's severity.

in practice it results in some inequality. The problems of government are practical and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Id.* at 485, 90 S.Ct. at 1161 (internal quotations and citations omitted).

This same deference to the legislature's prerogative in drawing reasonable classifications was recognized by this court in *Bellendir v. Kezer,* 648 P.2d 645 (Colo.1982). In *Bellendir,* the claimant argued that the failure of the Workers' Compensation Act to provide for increases in past compensation awards to keep pace with inflation violated equal protection of the laws. In rejecting that argument, we concluded:

Obviously, the statutory formula is arbitrary in the sense that the General Assembly might have chosen some other method of computing disability benefits. Our inquiry is limited, however, to whether the scheme as presently constituted furthers a legitimate state purpose in a rational manner.... [W]e do not mean to indicate that the present statute necessarily best fulfills the social and economic objectives it was designed to achieve or that a more just system could not be formulated.... However, it is not the function of this Court to rewrite legislation; the power to change the present scheme rests with the General Assembly.

*Id.* at 647.

■■ The fact that the legislature's line-drawing may be imperfect, may result in some inequities in individual cases, or may have been tailored more precisely does not warrant a reviewing court striking down that classification. A statute will not be found unconstitutional under the rational basis test because the distinctions created by the legislature are not made with "mathematical nicety." *Dawson ex rel. McKelvey v. Public Employees' Retirement Ass'n,* 664 P.2d 702, 708 (Colo.1983) (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). Rather, the problems of government being practical ones,

equal protection will tolerate "a rough accommodation of variant interests." *Id. See also Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) ("the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines"). So long as the distinction drawn by the General Assembly is rationally related to some governmental interest, the Equal Protection Clause is not offended simply because the line which is drawn is imperfect.

Contrary to petitioners' repeated assertions, common sense suggests that not all partial injuries are as severe or as debilitating as total injuries or injuries to the trunk or head. While partial injuries may be as severe as total injuries in some circumstances, clearly this is not true all of the time. No empirical evidence was presented to establish the extent to which any generalization regarding the similarity of injuries holds true. Thus, petitioners are correct in noting that the line drawn by the General Assembly between partial and total disabilities may not *always* represent a "true" distinction in terms of the severity of those two types of injuries. On the other hand, in some circumstances, that line will reflect a meaningful distinction in the severity of certain injuries which are more complex in terms of diagnosis, treatment and overall effect on the injured worker. Oddly enough, petitioners themselves make perhaps the most compelling case for the reasonableness of the distinction between partial and total injuries when they argue that "partial injuries differ only in degree from total injuries." What greater rational reason is there for awarding different benefits for injuries than a differentiation based on the relative severity of those injuries?

■■ In our judgment, the legislature reasonably could have concluded that the partial injuries covered in section 8–42–107(2), such as an injury to the hand, are, generally speaking, of a different character and severity than injuries covered under section 8–42–

107(8), such as injuries to the back.[11] For instance, when looking at the working population as a whole, it is reasonable to assume that injuries to the torso or head are significantly different from extremity injuries in terms of their impact on the ability to work. Likewise, it is reasonable to assume that in general, partial injuries to an extremity have less of an impact than the total loss of an extremity in terms of the ability to work. While petitioners are quite right in pointing out that a 95% impairment of the hand is not significantly different than a total loss of the hand, this in no way calls into question the reasonableness of the legislature's classification *in general.* Given the almost limitless array of potential injuries and their impact on the ability to work, any line drawn by the legislature will necessarily be imperfect. This is simply the necessary result of line-drawing in this context. As such, so long as individualized hearings are not granted in each and every case, virtually any classification drawn by the legislature will be imperfect, which is not to say that any line drawn by the legislature will necessarily be irrational. *See discussion, supra,* at 14–16. *See also Califano v. Boles,* 443 U.S. 282, 284, 99 S.Ct. 2767, 2770, 61 L.Ed.2d 541 (1979) (" 'General rules are essential if a fund of this magnitude [i.e., Social Security] is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases.' ") (quoting *Califano v. Jobst,* 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977)).

Thus, regardless of the merit of petitioners' argument that the statutory classification between partial and total injuries may result in some anomalous and relatively inequitable benefit awards when judged by reference to the severity of certain injuries, the only real question here is whether "any state of facts reasonably can be conceived that would sustain it." *Colorado Soc'y of Community and Institutional Psychologists, Inc. v. Lamm,* 741 P.2d 707 (Colo.1987). We hold a rational basis exists for the legislature's statutory classification which differentiates between full and partial injuries.

### B

■ We now turn to the second inquiry in a rational basis examination, whether "the statutory classification bears a reasonable relationship to a legitimate government interest." *Western Metal v. Acoustical and Constr.,* 851 P.2d 875, 881 (Colo.1993). We have little difficulty concluding that the legislative classification for partial as opposed to total injuries has some reasonable relation to a legitimate governmental interest.

■ The Act is expressly intended to provide "quick and efficient delivery of disability and medical benefits" to injured workers "without the necessity of any litigation" and "at a reasonable cost to employers." § 8–40–102, 3B C.R.S. (1994 Supp.). These interests are legitimate. *See Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 321–22, 105 S.Ct. 3180, 3189–90, 87 L.Ed.2d 220 (1985). The statutory scheme mandates that both employers and employees relinquish their rights to litigate claims. *See Frohlick Crane Serv., Inc. v. Mack,* 182 Colo. 34, 510 P.2d 891 (1973) ("The statutory scheme grants the employee compensation from the employer, even though the employ-

11. We reject petitioners' argument that section 8–42–107(2) is merely a legislative dinosaur which relies on an "outdated and inaccurate schedule rather than on the AMA Guides." Petitioners correctly point out that the schedule was originally adopted in 1915; however, the general assembly has revisited this section which was comprehensively amended in 1991, Ch. 219, sec. 15, § 8–42–107, 1991 Colo.Sess.Laws 1291, 1306–07, again amended in 1992, Ch. 238, sec. 1, § 8–42–107(8)(d), 1992 Colo.Sess.Laws 1827; Ch. 239, sec. 1, § 8–42–107(7)(b), (8)(c.5) 1992 Colo.Sess.Laws 1833, and in 1993, Ch. 106, sec. 1, § 8–42–107(8)(c), 1993 Colo.Sess.Laws 365 and in 1994, Ch. 322, sec. 4, § 8–42– 107(2)(a.5)(b)(c)(w.5)(x)(y), (7)(b), Colo.Sess. Laws 2000, 2002. A statutory amendment generally reflects a change in the law. *Darby v. All J. Land and Rental Co.,* 821 P.2d 297 (Colo. 1991). Far from being stagnant these changes reflect the general assembly's attempt to "counter inequities or imperfection in the statutory scheme." *See Rosa v. Warner Elec. Contractors,* 849 P.2d 845 (Colo.App.1992), *aff'd on other grounds,* 870 P.2d 1210 (Colo.1994). Further, petitioners ignore changes in the statutory weekly compensation which has increased over time from $8 per week in 1915, to $84 per week in 1986 and finally to the current rate of $150 in 1990.

ee may be negligent and even if the employer is not negligent. In return, the employer who is responsible under the Workmen's Compensation Act is granted immunity from common-law claims.") *Id.* at 38, 510 P.2d at 893.

It is difficult to imagine any feasible workers' compensation system which could provide both quick delivery of benefits and a hearing in every individual case to determine the fairest and most accurate amount of benefits for every particularized injury.[12] Adopting a standardized and fixed schedule to determine those benefits is, therefore, clearly related to the interest in providing efficient and fair benefit awards. Indeed, petitioners concede this general proposition insofar as they argue that the benefits formula contained in section 8–42–107(8)—which is fixed and inflexible—should be applied to all partial disability benefit awards. Petitioners' objection therefore is not to the use of a fixed formula to decide benefits, but rather to the continued use of the formula contained in § 8–42–107(2).

We conclude that the classification drawn between partial and total injuries is rational, and that the imposition of a fixed schedule for determining an award of benefits is rationally related to the governmental interest in providing efficient and fair benefits. The fact that the legislative scheme adopts two different formulas for calculating benefits does not change this conclusion. Having determined that the distinction between partial and total injuries is rational, there can be little doubt that applying a different formula for calculating benefits for those different injuries is also rational, and is rationally related to the interests in efficiency and fairness.

We conclude that the legislative classification, while imperfect, is rationally related to a legitimate governmental interest. Thus, we reject petitioners' argument that the statutory classification violates equal protection of the laws as guaranteed under the federal and state constitutions.

IV

In addition to the equal protection argument raised in these consolidated cases, certiorari was also granted in Duran's case to address the question of whether "the court of appeals erred in denying a petition for certiorari under section 8–43–307, 3B C.R.S. (1992 Supp.), and C.A.R. 46 on the ground that 'this case lacks an evidentiary record regarding the constitutional issue raised?' "

▓ Because we have reached the merits of Duran's constitutional challenge and affirm ICAP's ruling affirming the ALJ's award of benefits, we need not address this issue as it is now moot. A question is moot if its resolution cannot have any effect upon an existing controversy. *Reserve Life Ins. Co. v. Frankfather,* 123 Colo. 77, 225 P.2d 1035 (1950). We have concluded that Duran's equal protection challenge to the Workers' Compensation Act of Colorado must fail, and that the initial award of benefits to him was proper. Accordingly, the substantive aspect of his appeal has been decided. The question of whether the court of appeals properly denied his petition for certiorari has no bearing on his award of benefits and thus, it can have no effect on this legal controversy.

The rulings of ICAP affirming both orders of the administrative law judges are affirmed.

---

**12.** Adoption of S.B. 91–218 did not change the overall goal of the Act to provide timely and equitable benefits to injured employees, rather it changed the method of calculation of the benefits based on the perceived severity of the injury. The dual method of benefit calculation does not indicate a legislative attempt to reduce the benefits payable to certain injured individuals but rather to allow greater compensation for individuals who the general assembly has reasonably perceived sustain more significant injuries, while still minimizing all litigation costs.