COLORADO AFL–CIO; Kent Replogle; Stephen P. Cramer; Mark Harkman; James Martinez; Lawrence Smith; Mae L. Durant; and David Organ, Plaintiffs–Appellants,

v.

John J. DONLON, Executive Director, Department of Labor and Employment; Kenneth M. Platt, Director, Colorado Division of Workers' Compensation; Bruce Posey, Executive Director of Colorado Department of Administration; Edwin L. Felter, Jr., Director, Administrative Hearings and Chief Administrative Law Judge; Workers' Compensation Coalition; and Colorado Compensation Insurance Authority, Defendants–Appellees.

Nos. 93CA1118, 93CA1392.

Colorado Court of Appeals,
Div. II.

June 15, 1995.

As Modified on Denial of Rehearing
July 13, 1995.

Certiorari Denied April 1, 1996.

Wilcox & Ogden, P.C., Ralph Ogden, Turner and Meiklejohn, P.C., Robert W. Turner, Scott A. Meiklejohn, Denver, for plaintiffs-appellants Colo. AFL–CIO, Kent Replogle, Stephen P. Cramer, Mark Harkman, James Martinez, Lawrence Smith and Mae L. Durant.

Elrod, Katz, Preeo, Look, Moison & Silverman, P.C., Eldon E. Silverman, Gilbert R. Egle, Denver, for plaintiff-appellant David Organ.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Mary Karen Maldonado, Michael P. Serruto, Sr. Asst. Attys. Gen., Denver, for defendant-appellee John J. Donlon, Executive Director, Dept. of Labor and Employment, Kenneth M. Platt, Director, Colo. Div. of Workers' Compensation, Bruce Posey, Executive Director of Colo. Dept. of Admin., and Edwin L. Felter, Jr., Director, Administrative Hearings and Chief Administrative Law Judge.

Plaut, Lipstein & Mortimer, P.C., Frank Plaut, Charles E. Mortimer, Jr., Evan S. Lipstein, Lakewood, Berry & Singer, John Berry, Denver, for defendant-appellee Workers' Compensation Coalition.

Michael J. Steiner, Colo. Compensation Ins. Authority, Vaughan, Reeves and DeMuro, David R. DeMuro, Weinberger & Kanan, P.C., Thomas L. Kanan, Denver, for defen-

dant-appellee Colo. Compensation Ins. Authority.

Opinion by Judge CRISWELL.

In separate declaratory judgment actions filed in the trial court, plaintiff, David Organ, in one instance, and all of the other plaintiffs in a second case, sought court decrees declaring various provisions of the 1991 amendments to the Workers' Compensation Act (Act) unconstitutional. After consolidating the two actions for trial and disposition, the trial court rejected all of plaintiffs' contentions and entered judgment dismissing their claims, from which judgment plaintiffs appeal. We affirm in part and reverse in part.

## I. *The Organ Appeal*

■ Plaintiff Organ was employed by a contractor who had been engaged to build a new home for a couple in Loveland, Colorado. During the course of that construction, Organ was seriously injured as a result of an industrial accident. At the time of that accident, the house being built was not habitable and was not, in fact, inhabited until some eight months later, when the owners moved in.

Prior to its amendment in 1991, the Act provided that an owner of property, who contracted for work to be done on that property, was to be considered a statutory employer of the contractor and of his or her employees. However, it also provided that the owner of a "private home" would be excepted from this provision. Section 8–48–102(1), C.R.S. (1986 Repl.Vol. 3B). But, a division of this court had interpreted this exception to apply only to residential structures that were inhabited, or were capable of being inhabited, at the time of the injury; the structure was not considered to be a "private home" during the period of its construction. *Betts v. Kempers,* 745 P.2d 283 (Colo.App.1987).

One of the 1991 amendments to the Act, § 8–41–402(1), C.R.S. (1994 Cum.Supp.), changed the term "private home" to "residential real property which meets the definition of a 'qualified residence' under section 163(h)(4)(A) of the federal 'Internal Revenue Code of 1986,' as amended." Organ asserts that such definition is implicated under the Internal Revenue Code only if there is a mortgage upon the property, so that the interest paid on the obligation secured by such encumbrance is deductible for income tax purposes. He argues that, if there exists no such encumbrance, there can be no "qualified residence" under the Internal Revenue Code. He concludes, therefore, that this 1991 amendment violates equal protection guarantees by distinguishing between properties that are encumbered and those that are not and by providing workers' compensation benefits only to those workers who are employed upon unencumbered residences.

However, in the administrative proceedings upon Organ's workers' compensation claim, the Industrial Claim Appeals Office rejected this interpretation of the statute. Both that tribunal and a division of this court in the later opinion in *Organ v. Jorgensen,* 888 P.2d 336 (Colo.App.1994) concluded that the only purpose of the reference to the Internal Revenue Code's definition of "qualified residence" in § 8–41–402(1) was to change the interpretation of the term "private home" that was adopted in *Betts v. Kempers, supra.* Its purpose is to make clear that a residence under construction can be a qualified residence under certain conditions. *See* Temp.Treas.Reg. § 1.163–10T(p)(5) (1987). Thus, § 8–41–402(1) does not draw any distinction for this purpose between residential properties with encumbrances and those that are free of any encumbrance.

Hence, because the statute does not create any distinction of the type foreseen by Organ, there exists no basis for his claim of a denial of equal protection.

■ We recognize that, in Organ's reply brief, filed with this court after the issuance of the opinion in *Organ v. Jorgensen, supra,* the argument is made that § 8–41–402(1) also creates two other classes—those workers who engage in working on qualified residences and all other workers. It is then argued that workers in the first class are discriminated against because they may be required to wait for a period approaching 24 months before a determination can be made

whether owners of residential properties are statutory employers, while all other workers are entitled to more expeditious determinations.

However, because this argument was not previously advanced, we decline to address it. *See People v. Czemerynski,* 786 P.2d 1100 (Colo.1990); *Knappenberger v. Shea,* 874 P.2d 498 (Colo.App.1994).

## II. *The Other Plaintiffs' Claims*

The other plaintiffs consist of individuals affected by the 1991 amendments by virtue of having sought benefits for an industrial injury sustained after their effective date plus the Colorado AFL–CIO, a labor organization. The trial court accorded all plaintiffs standing, and defendants do not contest that ruling.

### A. *The "Age Cap" on Permanent Total Disability Benefits*

■ Section 8–42–111(5), C.R.S. (1994 Cum.Supp.) provides that, for those injuries occurring between July 1, 1991, and July 1, 1994, all payments for permanent total disability will cease when the employee reaches 65. Payments for any temporary disability or permanent partial disability continue beyond this age without interruption. Plaintiffs assert that this statute violates their right to equal protection by discriminating against the older worker. We agree.

This issue was considered and determined favorably to plaintiffs' assertion in *Romero v. Industrial Claim Appeals Office,* 902 P.2d 896 (Colo.App.1995). We conclude, therefore, that plaintiffs are entitled to a declaratory decree determining that § 8–42–111(5) is invalid, and we shall remand the cause to the trial court to enter such a decree.

### B. *"Scheduled" Versus "Non–Scheduled" Benefits*

■ As the statute existed prior to the 1991 amendments, it created two different methods for determining benefits for permanent disabilities. *See* Colo.Sess.Laws 1990, ch. 62, § 8–92–107 at 491–93.

First, the Act established a schedule that described various losses of the upper or lower extremities (and various parts thereof), the loss of an eye, deafness, and blindness. It then provided for the payment of a specified number of weeks' indemnity for each specific loss described. In addition, it provided that, in the case of a total or partial loss of use of any of the members described in the schedule, the Director of the Division of Labor had discretion to award compensation benefits either under the schedule (based upon the relationship between the percentage of the loss of use and the amount of benefits to be awarded for a total loss of the member) or "under the permanent partial disability section" of the Act. Colo.Sess. Laws 1990, ch. 62, §§ 8–42–107.

On the other hand, Colo.Sess.Laws 1990, ch. 62, § 8–42–110 at 493–494 required the Director, in determining a claimant's permanent partial disability, to consider the claimant's general physical condition and mental training, ability, former employment, and education and to determine the extent of his or her general permanent disability, expressed as a percentage.

While not the sole criterion upon which such percentage was to be based, the effect of the claimant's physical impairment upon his or her earning capacity was an important factor to be considered in determining the amount of disability. *Byouk v. Industrial Commission,* 106 Colo. 430, 105 P.2d 1087 (1940); *Dravo Corp. v. Industrial Commission,* 40 Colo.App. 57, 569 P.2d 345 (1977).

The 1991 amendments changed the foregoing method of determining permanent compensation benefits in two important ways.

First, while the schedule under § 8–42–107 continued to apply to the loss, and to the loss of use (whether total or partial), of any member described in the schedule, the discretion of the Director to award benefits for such losses under the permanent partial disability section of the Act was repealed. *See* Colo. Sess.Laws 1991, ch. 219, § 8–42–107(7)(b) at 1308–1309. The benefits to be awarded for the loss, or total or partial loss of use, of any member described in the schedule were required to be limited to the benefits set forth in that schedule. Section 8–42–107(1), C.R.S.

(1994 Cum.Supp.) As amended in 1991, the statute made no distinction between a total or partial loss and a total or partial loss of use of any member of the body described in the schedule.

Second, for permanent impairments not described in the schedule, the 1991 amendments replaced the former method of determining the extent of a claimant's permanent disability, which had required consideration of various factors, including the effect of the injury upon the claimant's earning capacity. Instead, the amendments adopted a system whereby permanent partial disability benefits are to be determined based upon guidelines adopted by the American Medical Association (AMA) to which a formula set forth in the Act, which considers the claimant's income and age at the time of the injury, is to be applied. *See* Colo.Sess.Laws 1991, ch. 219, § 8–42–107(8) at 1309–1311. Hence, the determination of benefits for injuries not described in § 8–42–107 is, under the 1991 amendments, also to be made by reference to a "schedule," *i.e.*, the AMA guidelines.

The foregoing was the rating system that was in existence until May 26, 1992, when the General Assembly enacted an additional subsection, *i.e.*, Colo.Sess.Laws 1992, ch. 239, § 8–42–107(8)(c.5) at 1833–1834. This later amendment provides, in effect, that, if an injury results in the total loss or total loss of use of the upper or lower extremities, or of an eye, such impairment will be compensated under the permanent impairment section of the Act, *i.e.*, under § 8–42–107(8), by reference to the AMA guidelines, rather than under the statutory schedule, § 8–42–107(1). Thus, the 1992 amendment distinguishes between a total loss or total loss of use, on one hand, and a partial loss or partial loss of use, on the other.

Plaintiffs here argue that the distinction drawn by the *1992* amendment violates the requirements of equal protection; they do not argue that the *1991* version of the Act is invalid.

This was the same issue that was considered and resolved by the supreme court in *Duran v. Industrial Claim Appeals Office*, 883 P.2d 477 (Colo.1994). There, the court concluded that the distinction drawn by the Act between a total loss or total loss of use and a partial loss or partial loss of use has a sufficient rational relationship to the purposes of the Act as to allow the General Assembly to adopt differing means for compensating for such losses. And, while plaintiffs here argue that this record contains certain evidence not referred to by the court in *Duran*, we are of the view that that opinion is binding upon us and is dispositive of plaintiffs' assertion with respect to this portion of the Act.

## C. *The Procedure Regarding Independent Medical Examination*

 Under §§ 8–42–105 and 8–42–106, C.R.S. (1994 Cum.Supp.), temporary disability benefits are paid until the claimant reaches maximum medical improvement (MMI), unless such benefits have already terminated for other reasons. When MMI is reached, the claimant's degree of permanent medical impairment (if any) is then determined for purposes of calculating an award for permanent disability under § 8–42–107(8). The claimant's treating physician makes the initial determination of MMI and degree of impairment. Since these two facts are of considerable financial consequence, they have historically been the subject of extensive litigation. The General Assembly sought to decrease such litigation by providing that, if either party disputes the finding of the treating physician as to MMI or degree of impairment, that party may require that an independent medical examination (IME) be performed. If the parties can agree on the selection of the physician to perform the IME, the opinion of such physician will be final and unreviewable; if they cannot so agree, the Director will select the physician, and that physician's opinion upon the issues involved can then be overcome only by clear and convincing evidence. Sections 8–42–107(8)(b) and 8–42–107(8)(c), C.R.S. (1994 Cum.Supp.).

Plaintiffs assert that these provisions deny to them their right to procedural due process of law. We disagree.

 First, we reject plaintiffs' argument that the provision allowing the parties,

*by mutual consent,* to select an IME physician whose decision shall be final, somehow violates procedural due process. Procedural due process rights can be waived, *Walton v. Industrial Commission,* 738 P.2d 66 (Colo. App.1987), and a claimant's agreement to accept the results of an IME as binding would constitute such a waiver.

■■■ We consider, therefore, the validity only of the alternative procedure pursuant to which the Director may select a physician whose determination may be overcome only by clear and convincing evidence.

Plaintiffs argue that requiring proof by such a standard violates their rights to procedural due process because there is no logical basis to presume that the opinion of the IME physician is entitled to greater weight. We will assume, without deciding, that a statute creating an enhanced burden of proof with respect to an issue can be characterized as one that creates a presumption. We conclude, nevertheless, that there is a rational reason for giving the opinion resulting from the IME an initial (but not irrebuttable) presumption of validity.

Plaintiffs assert that, because both physicians (treating and IME) are required by statute to possess the same medical qualifications and both have examined the claimant, there is no reason to accord greater weight to the opinion of the IME physician. They contend that to do so is, in fact, irrational, because the treating physician is at least as likely to be correct because of that physician's greater familiarity with the claimant's condition. We reject these contentions.

The treating physician is always chosen in the first instance either by the claimant or by the employer. *See* § 8–43–404(5), C.R.S. (1994 Cum.Supp.). This fact provides a proper basis for the legislative conclusion that the possibility exists that such physicians may be biased in favor of the selecting party; indeed, plaintiffs themselves have argued as much. Hence, the General Assembly could reasonably conclude that a physician selected by an unbiased, independent tribunal will produce a more reliable opinion.

Further, the treating physician's "greater familiarity" may be of little significance. The determinations of MMI and degree of impairment are matters of diagnosis rather than of treatment, and much of the treating physician's time is spent in treating the claimant. In addition, the physician performing the IME is not forbidden, but is required, to spend as much time as necessary to accomplish a reliable assessment.

Finally, by creating an enhanced burden of proof in such instances, the General Assembly might well have believed that litigation over such issues will be reduced. This is a proper goal, and the legislation has a rational relationship to such goal.

We conclude, therefore, that plaintiffs have failed to demonstrate that the procedures prescribed by § 8–42–107(8) result in any violation of procedural due process.

### D. *Benefits for Mental Impairments*

■■■ Plaintiffs' also lodge an equal protection challenge to § 8–41–301(2), C.R.S. (1994 Cum.Supp.). Under this statute, a claimant suffering from a mental impairment that is unaccompanied by any physical injury and is not caused by a crime of violence is entitled only to twelve weeks' permanent disability benefits, at a rate not to exceed fifty percent of the state average weekly wage, minus any temporary benefits received. *See City of Thornton v. Replogle,* 888 P.2d 782 (Colo. 1995).

Plaintiffs argue that this provision violates their right to equal protection because claimants suffering such impairments do not differ in any constitutionally significant manner from claimants who have suffered identical impairments resulting from physical causes. Hence, they argue, the legislative classification thus drawn has no reasonable basis in fact. We disagree.

■■■ The state has a legitimate interest in controlling the cost to employers of the workers' compensation system. *Duran v. Industrial Claim Appeals Office, supra.* This interest is rationally promoted by measures which minimize the amount of money spent on claims that are not properly compensable under the Act. *See Tomsha v. City of Colorado Springs,* 856 P.2d 13 (Colo.App. 1992).

Here, the General Assembly could reasonably have concluded that, if an employee has not suffered a physical injury on the job or has not been the victim of a crime of violence, it is less likely that the conditions of employment were the primary cause of that employee's mental impairment. Indeed, this distinction between mental impairments caused in conjunction with a physical injury or while the individual is within a "zone of danger" and those not resulting from such causes has long been recognized as a proper distinction to draw under the common law for the award of tort damages for mental suffering based on negligence. *See Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877 (Colo.1994) (fn. 3) ("We have never recognized a cause of action for emotional distress grounded in negligence without proof that the plaintiff sustained physical injury or was in the 'zone of danger.' ").

Further, plaintiffs' argument here is similar to the one rejected in *Claimants in re Death of Kohler v. Industrial Commission*, 671 P.2d 1002 (Colo.App.1983). There, the challenged statute provided that, in order for a heart attack to be considered to be an "accident" and compensable under the Act, a claimant had to prove that it was caused by "unusual exertion." Plaintiffs argued that this violated their right to equal protection because claimants suffering from other injuries were not subjected to this heightened standard for proving causation. Rejecting this argument, a division of this court held that the state had a legitimate interest in restricting compensation to only those injuries whose causal roots lie in the work place. Hence, the difficulty of determining the cause of many heart attacks provided a rational basis for their disparate treatment.

The same reasoning applies here. Unlike the case of mental impairments resulting from on-the-job physical injuries or those resulting from a crime of violence occurring during the course of a claimant's employment, the non-physical cause or causes of mental impairments may be difficult to ascertain. Such impairments may result from numerous other causes, as well as from some extraordinary working condition. Thus, there is a rational basis for requiring physi-

cal injury or occurrence of a crime of violence during the course of employment as additional proof of a work-related causation.

We conclude, therefore, that there is a rational relationship between the classes of mental impairments recognized by the General Assembly and the legitimate purposes that it was attempting to achieve. Hence, § 8–41–301(2) does not offend against any equal protection guaranty.

### E. *The Limitation on Disability Benefits*

 Plaintiffs finally contend that § 8–42–107.5, C.R.S. (1994 Cum.Supp.) also violates their right to equal protection. We disagree.

Section 8–42–107.5 imposes limits on the total combined amount of temporary and permanent partial disability benefits a claimant may receive. It provides that, if a claimant's permanent impairment rating is 25% or less, the maximum benefits to be paid for both temporary and permanent disability shall be no more than $60,000. If the impairment rating exceeds 25%, the combined payments cannot exceed $120,000.

Plaintiffs premise their challenge on the assertion that temporary and permanent benefits are conceptually distinct; they say that temporary benefits merely compensate claimants for wages actually lost during recuperation, whereas permanent benefits are in the nature of liquidated damages for the physical injury suffered. Plaintiffs then assert that different claimants with identical injuries may require differing amounts of time to reach MMI, and thus, awards will consist of different proportions of temporary and permanent benefits. Hence, it is asserted, claimants with identical injuries will receive different amounts of "damages" (payments for permanent disability), despite being otherwise similarly situated.

 It is true that payments for temporary disability are designed to replace a claimant's immediate lost wages during the period that he or she is temporarily unable to work. *Safeway Stores, Inc. v. Husson*, 732 P.2d 1244, 1245 (Colo.App.1986) (temporary compensation benefits are a "substitute for lost wages or impaired earning capacity").

But, payments for permanent partial disability are, contrary to plaintiffs' allegations, not the equivalent of tort damages for personal injuries. On the contrary, such payments are *also* premised on the loss of the ability to earn wages, *i.e.*, on a loss of claimant's earning capacity. *See Mesa Manor v. Industrial Claim Appeals Office,* 881 P.2d 443 (Colo. App.1994) (cert. denied as improvidently granted January 18, 1995).

At common law, earning capacity considerations are used as one of the many factors with which to calculate the amount of tort damages to be awarded as a substitute for that which plaintiff has lost, *i.e.*, the physical injury suffered. *See* 2 D. Dobbs, *Law of Remedies* § 8.1 (2d ed. 1993). By contrast, in workers' compensation, lost earning capacity is itself the asset which plaintiff has lost and for which a dollar award is calculated. *See Matthews v. Industrial Commission,* 44 Colo.App. 159, 627 P.2d 1123 (1980); *see generally* 1C A. Larson, *Workmen's Compensation Law* § 57.11 (1994) ("It has been stressed repeatedly that the distinctive feature of the compensation system, by contrast with tort liability, is that its awards ... are made not for physical injury as such, but for 'disability' produced by such injury.")

This is true despite the fact that there may be different methods of calculating such lost capacity—*e.g.*, scheduled vs. non-scheduled awards, *see Duran v. Industrial Claim Appeals Office, supra; Matthews v. Industrial Commission, supra,* or temporary vs. permanent benefits. *See* 1C A. Larson, *Workmen's Compensation Law* § 57.14 (1994).

And, while they changed the method of calculation, the 1991 amendments did not change the nature of the compensatory goals of the Act. *See Duran v. Industrial Claim Appeals Office, supra.* Although a simplified system, utilizing a mathematical formula rather than extensive litigation requiring conflicting testimony of experts in various specialized fields, has been adopted for the determination of a claimant's degree of disability, nothing within the amendments suggests that the General Assembly intended to change the nature of the loss for which permanent partial disability benefits are designed to compensate. Whether computed from a statutory schedule or from a formula based upon the AMA schedule, the benefits payable, either temporary or permanent, are intended to compensate a claimant for the extent to which his or her physical impairment impacts upon that claimant's past and future ability to earn wages.

Further, Colorado's compensation scheme has traditionally incorporated a limit upon the amount of benefits that may be received for a permanent partial disability. *See, e.g.,* § 8–51–108(1)(b), C.R.S. (1986 Repl.Vol. 3B) (payments for permanent partial disability cannot exceed $26,292). And, plaintiffs do not argue that establishing a 25% disability as the line between the two statutory limits constitutes anything other than proper legislative line-drawing. *See Firelock, Inc. v. District Court,* 776 P.2d 1090 (Colo.1989); *Naiden v. Epps,* 867 P.2d 215 (Colo.App. 1993).

Although there are, admittedly, some differences in the underlying purposes served by temporary and permanent benefits, given that the general purpose of both types of benefits is to compensate for a present or future possible wage loss, there is no improper discrimination that results from the placing of a limit upon the total benefits, both temporary and permanent, to be received. On the contrary, by extending the limit to include temporary benefits, the General Assembly seeks to encourage employees to return to full-time employment as soon as they are physically able to do so and to discourage malingering.

We conclude, therefore, that the limits established by § 8–42–107.5 do not violate any equal protection guaranty.

That part of the district court judgment determining that § 8–42–111(5), C.R.S. (1994 Cum.Supp.) is constitutional is reversed, and the cause is remanded to that court for the entry of an appropriate declaratory decree consistent with the views set forth in this opinion. In all other respects, the judgment is affirmed.

ROY, J., concurs.

BRIGGS, J., specially concurs.

Judge BRIGGS specially concurring.

I join in the majority opinion. However, the opinion does not directly address plaintiffs' contention that the supreme court's decision in *Duran v. Industrial Claim Appeals Office,* 883 P.2d 477 (Colo.1994), which upheld against an equal protection challenge the classification created by §§ 8–42–107(2) and 8–42–107(8)(c.5), C.R.S. (1994 Cum. Supp.), is distinguishable based on the evidence presented in this case. I write separately to explain why, in my view, the supreme court's decision is controlling and cannot be distinguished.

Section 8–42–107(8)(c.5) provides that when an injury results in the total loss or loss of use of an eye or any member specified in the old schedule in § 8–42–107(2), first codified in 1915, then benefits are calculated, not under that schedule, but under the new schedule in § 8–42–107(8), C.R.S. (1994 Cum. Supp.), enacted in 1991. *See* Colo.Sess.Laws 1991, ch. 219, § 8–42–107(8) at 1309–11. Benefits for partial loss or loss of use of an eye or any specified member continue to be calculated under the old schedule.

The essence of plaintiffs' equal protection claim is that it is irrational to require that benefits be provided for a partial loss or loss of use of a member under the old schedule, no matter how close to total that partial loss or loss of use may be, while at the same time providing disproportionately greater benefits under the new schedule for the total loss or loss of use of the same member. However, as aptly pointed out in the majority opinion, the supreme court in *Duran v. Industrial Claim Appeals Office, supra,* expressly upheld this statutory scheme against the precise equal protection challenge plaintiffs raise in this case.

Plaintiffs seek to distinguish *Duran* on the premise that it lacked the broad evidentiary record present here. For example, the supreme court in *Duran* noted that: "No empirical evidence was presented to establish the extent to which any generalization regarding the similarity of injuries holds true." *Duran v. Industrial Claim Appeals Office, supra,* at 483. Nor was there reference in *Duran* to evidence comparing the ease in calculating benefits under the two schedules.

Plaintiffs argue it was this lack of evidence that led the supreme court to conclude that the classification created by the old and new schedules was rationally related to the governmental interest in efficiency and fairness. They characterize the decision as a rejection of an "as applied" equal protection challenge.

In contrast, plaintiffs in this case introduced evidence to rebut the assumptions underlying the decision in *Duran.* Plaintiffs contend that based on this evidence we should distinguish the supreme court's conclusion that this statutory scheme is rationally related to the governmental interest in efficiency and fairness.

Plaintiffs' argument in effect is that the evidence they presented at trial satisfied their burden "to negative every conceivable basis which might support [the challenged statutory scheme]." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211, 217 (1993). However, no matter how persuasive plaintiffs' evidence may seem, in my view we cannot distinguish the holding in *Duran* based upon it.

The distinction relied on by plaintiffs depends on the unfounded assumption that if the supreme court in *Duran* did not discuss a piece or a kind of evidence, the record before it must not have contained any such evidence. More importantly, plaintiffs' argument reflects a misapprehension of the role of factfinding in resolving an equal protection challenge previously resolved by a higher court.

The supreme court in *Duran* held that, because receipt of workers' compensation benefits is not a fundamental right, the rational basis test must be applied. A statutory classification concerning these benefits therefore does not violate the right to equal protection unless it has no rational basis or is not rationally related to a legitimate governmental purpose.

Under this test, a statutory classification must be upheld against an equal protection challenge if there are any reasonably conceivable facts that could provide a rational basis for the classification. Factfinding thus

plays a different role even in the initial consideration of an equal protection challenge:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

> . . . .

> In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.

> . . . .

> The assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immuniz[e]' the congressional choice from constitutional challenge.

*F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2101–04, 124 L.Ed.2d 211, 215–218 (1993); *see also Vance v. Bradley,* 440 U.S. 93, 110–11, 99 S.Ct. 939, 949, 59 L.Ed.2d 171, 184 (1979) ("In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.").

The supreme court in *Duran* in effect determined as a matter of law that the facts are at least arguable as to whether the payment of benefits under the different schedules in §§ 8–42–107(2) and 8–42–107(8) is rational. It therefore concluded the statutory scheme is not unconstitutional. The relief plaintiffs seek would require us not to distinguish that conclusion, but to reach the opposite conclusion.

That the evidence presented in this case may appear to rebut the presumptions on which the supreme court's conclusions in *Du-ran* was premised provides us with no authority effectively to overrule it. Furthermore, if the supreme court's legal conclusion were subject to being distinguished based on evidence presented at a later hearing, the constitutionality of the same statutory scheme might vary from case to case, depending on the efforts of the parties and the skills of their counsel.

Plaintiffs are therefore left with the argument that, when this statutory scheme is properly understood, no set of facts can be conceived that provides a rational basis for paying benefits under the old schedule in § 8–42–107(2) for injuries resulting in the partial loss or loss of use of a member while paying disproportionately greater benefits under the new schedule in § 8–42–107(8) for the total loss or loss of use of the same member. In light of the holding in *Duran,* plaintiffs' argument, whatever its merits, must be addressed either to the General Assembly or to the supreme court.