Mary Ann WHITESIDE, in her official capacity as Director of the Division of Workers' Compensation, State of Colorado; and Dona Halsey, David Cain, Kathy E. Dean, Bill Whitacre, and Robert Socolofsky, in their official capacities as Examiners of the Industrial Claim Appeals Office, Department of Labor and Employment, State of Colorado, Defendants–Appellants,

v.

Marvin SMITH, individually and on behalf of all other persons similarly situated, Plaintiff–Appellee.

No. 01SA399.

Supreme Court of Colorado,
En Banc.

April 7, 2003.

Ken Salazar, Attorney General, John D. Baird, First Assistant Attorney General, Eric Rothaus, Assistant Attorney General, State Services Section, Denver, Colorado, Attorneys for Defendants–Appellants.

Wilcox & Ogden P.C., Ralph Ogden, Goldstein & Dodge, Shelley P. Dodge, Denver, Colorado, Attorneys for Plaintiff–Appellee.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

In this case, we determine the constitutionality of a fee requirement mandated by certain provisions of Colorado's Workers' Compensation Act and its implementing regulations. Under the pertinent statutory sections and implementing workers' compensation rule, before an injured worker can challenge the termination of his temporary disability benefits and medical treatment, he must pay a $675 fee to obtain a Division Independent Medical Examination. We hold that such a fee provision, which requires an indigent worker to prepay a fee before he can obtain either administrative or judicial review of an adverse decision of the employer-selected treating physician, violates due process of law guarantees.

Martin Smith, an injured indigent claimant, filed suit against the Director of the Division of Workers' Compensation and the Examiners of the Industrial Claim Appeals Office in their official capacities under 42 U.S.C. § 1983, claiming that the statutory scheme was unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment. Smith alleged that his inability to pay the fee prevented him from challenging the termination of his temporary total disability benefits and medical treatment. The district court certified a class of present and future injured indigent claimants and struck down the fee provisions as unconstitutional on due process and equal protection grounds as applied to the certified class. The defendants appealed the district court's ruling directly to this court.

Although the fee requirement found in sections 8–42–107(8)(b)(II), 8–42–107(8)(c), 8–42–107.2(5), 3 C.R.S. (2002) and 7 C.C.R. 1101–3 ("Division Rule XIV(L)(4)") is valid on its face, it is unconstitutional as applied to the particular class of injured indigent claimants.[1] For such claimants, the statutory scheme prevents any administrative or judicial review of the termination of their right to temporary disability benefits and medical treatment, based solely on their inability to pay the fee. We hold that the fee requirement deprives injured indigent claimants of their property interests without due process as mandated by the Fourteenth Amendment. Because our holding disposes of this case, we do not reach the question of whether this fee requirement also violates the equal protection clause of the Fourteenth Amendment.

Thus, we affirm the judgment of the district court on the due process issue and return this case back to it for further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

On November 8, 1991, Marvin Smith injured his back while in the scope and course of his employment. Smith's exclusive remedy for those injuries was under Colorado's Workers' Compensation Act ("Act"). *See* §§ 8–40–101 to 8–47–209, 3 C.R.S. (2002).

Following Smith's injuries, Smith's employer and its insurance carrier filed a general admission of liability in which they admitted full responsibility for his injuries. As a result, Smith received temporary total disability benefits ("TTD") and medical treatment, as provided under the Act. *See* §§ 8–42–105, 8–42–106, 8–42–101(1)(a). Smith's pre-injury weekly wage was $458.09 and his temporary total disability rate was $305.39, which was two-thirds of his average weekly wage.

Pursuant to its statutory right, the employer's insurance company selected the physician who treated Smith. § 8–43–404(5)(a). Smith had no choice in selecting this doctor.

---

**1.** Our holding impacts and refers only to those claimants who are indigent, as determined by a neutral decision-maker pursuant to the criteria set forth in Chief Justice Directive 98–01.

Thereafter, the employer and its insurance carrier filed a final admission of liability in 1992. This final admission stated that the employer-selected, treating physician determined that Smith had reached maximum medical improvement ("MMI")[2] and that his permanent medical impairment rating was five percent of the whole person. As a result, Smith's employer reduced his disability benefits—now permanent benefits—to a rate of $120 a week. The insurance carrier also denied any responsibility for post-MMI treatment for Smith's back injuries.

Smith filed a timely objection to the final admission of liability which preserved his right to challenge all matters set forth in the admission, including the employer-selected physician's determination of MMI and his impairment rating. At that time, Smith did not request a Division Independent Medical Examination ("DIME"), which was a prerequisite to any administrative hearing challenging the findings of the employer-selected physician. *See* §§ 8–42–107(8)(b)(II); 8–42–107(8)(c). The statutory provisions and the implementing regulation mandated at the time that the party challenging the treating physician's determination pay a $450 fee for the DIME.[3]

In 1999, Smith filed a motion with the Director of the Division of Workers' Compensation.[4] In his motion, Smith requested that the Director find that he was indigent and therefore unable to pay the required fee for the DIME. Without a DIME, Smith could not challenge the employer-selected physician's determination of MMI and medical impairment rating. An administrative law judge denied the motion.

In 2000, Smith filed an application for a hearing with the Division of Administrative Hearings. Smith again requested a ruling that he was indigent and that either the Division or the insurance carrier pay for the cost of the DIME because he was unable to pay for it.

Upon reviewing Smith's application, an administrative law judge determined that Smith was indigent pursuant to Chief Justice Directive 98–01. However, the judge also determined that he lacked authority to waive the DIME fee or otherwise assess it. The judge ordered the denial and dismissal of Smith's request but noted that his ruling might deny, "in the constitutional sense," indigent claimants "a full opportunity to develop and litigate the issue of permanent disability." Smith appealed this ruling to the Industrial Claim Appeals Office but his claim was dismissed as premature.

Smith brought this action in the district court pursuant to 42 U.S.C. § 1983, claiming

**2.** The Act defines maximum medical improvement as "the point in time when any medically determinable physical or mental impairment as a result of injury has become stable and when no further treatment is reasonably expected to improve the condition." § 8–40–201(11.5).

**3.** The relevant provisions of the statutory scheme are as follows:

If either party disputes a determination by an authorized treating physician on the question of whether the injured worker has or has not reached maximum medical improvement, an independent medical examiner may be selected in accordance with section 8–42–107.2.

§ 8–42–107(8)(b)(II).

If either party disputes the authorized treating physician's finding of medical impairment, including a finding that there is no permanent medical impairment, the parties may select an independent medical examiner in accordance with section 8–42–107.2. The cost of such independent medical examination shall be borne by the requesting party.

§ 8–42–107(8)(c).

The requesting party shall advance the full cost of the independent medical examination to the [independent medical examiner] at least ten days before the appointed time for the examination.

§ 8–42–107.2(5).

The physician performing the IME shall be prepaid a total fee of $675.00 for each IME by the requesting party.

7 C.C.R. 1101–3, Division Rule XIV(L)(4)(a). For Smith, the fee was $450. The Division of Workers' Compensation has since raised the fee to $675.

**4.** At the time of Smith's injuries, there was no statutory deadline for requesting a DIME if the injured worker filed an objection to a final admission within sixty days. *See* § 8–43–203(2)(b), 3 C.R.S. (1997). Section 8–42–107.2(2)(b) now states that a claimant has only thirty days from the date the final admission was mailed in which to challenge the determinations of the employer-selected physician. The Division issued Rule IV(L)(3) to protect the timeliness of claims like Smith's that would otherwise be time-barred under the new statute. 7 C.C.R. 1101–3.

that the DIME fee requirement found in the statutory and regulatory provisions of the Act violated the constitutional rights of indigent workers' compensation claimants to due process and equal protection. Smith argued that the fee requirement unconstitutionally deprived indigent claimants of a hearing to challenge the MMI and medical impairment decisions of their employer-selected treating physicians.

■ The district court certified the case as a class action pursuant to C.R.C.P. 23(a) and (b)(2) and described the class as those entitled to compensation and who were found to be indigent.[5] On cross-motions for summary judgment, the court held that the fee requirement found in sections 8–42–107(8)(b)(II), 8–42–107(8)(c), 8–42–107.2(5) and Division Rule XIV(L)(4) were unconstitutional as applied to the class of indigent workers on two grounds.[6]

First, the district court held that the plaintiff class, as recipients of statutorily created temporary disability benefits, had a property interest in the continued receipt of those benefits. Because such benefits terminated

upon the employer-selected physician's determination of MMI, there were due process considerations applicable to the procedures surrounding the MMI determination. The district court concluded that the fee provisions violated the due process clause of the Fourteenth Amendment by requiring indigent claimants to pay a fee to obtain a DIME as a jurisdictional prerequisite to any opportunity to be heard on the employer-selected treating physician's determinations of MMI and permanent impairment ratings.

Second, the district court applied a rational basis test and sustained Smith's equal protection challenge. The district court held that while the statutory requirement for a DIME and the imposition of the cost of a DIME on the requesting party were rationally related to the state interest in the delivery of disability and medical benefits to injured workers at a reasonable cost to employers without the necessity of litigation, see § 8–40–102(1), there was no legitimate state interest in pursuing those goals at the cost of denying the plaintiff class any opportunity to be heard as occurs under the statutory scheme as a whole.[7]

5. The district court defined the class as follows: All current and future workers' compensation claimants who have been or will be discharged from care by their employer selected treating physician because they have reached maximum medical improvement (MMI), whether or not they have been given a permanent impairment rating; who seek a waiver of the IME fee imposed by C.R.S. §§ 8–42–107 and 8–42–107.2, in order to contest either the date of MMI or the maximum medical impairment rating; and *who are indigent.* (emphasis added). The defendants argue that certification of the class of indigent claimants under C.R.C.P. 23(a) and (2)(b) would result in unnecessary expense and unduly burden the judicial process. In particular, they argue that class certification is unnecessary because if the statutory provisions at issue are declared unconstitutional, they will be of no effect and the State may no longer enforce the offending provisions. We disagree. The district court properly found that all requirements of 23(a) were satisfied as to the class in its April 24, 2001 Order. In addition, class certification is proper under 23(b)(2) because Smith, as the representative plaintiff, is seeking a judicial declaration that the statutory provisions and implementing regulation are unconstitutional.

6. The district court rejected the defendants' argument that the court need not reach the constitutional issues raised by the plaintiff because under

section 8–43–502(3), the Director has the authority and discretion to charge the cost of the DIME to the employer or the insurer when the Director deems that a DIME is necessary to assist in resolving an issue of medical fact or opinion. Defendants argued that if the challenged sections are read in conjunction with section 8–43–502(3), the constitutional issues could be avoided. The court disagreed and held that defendants' argument would require disregarding the plain language of the challenged sections mandating that the claimant prepay the fee to obtain a DIME. The court also noted that such a reading of the statute was inconsistent with a January 2001 Order in which the Director stated that she lacked authority to order the insurance carrier or the employer to pay for a claimant-requested DIME.

7. In response to the district court's order invalidating the fee provisions, the Division issued a new rule. See 7 C.C.R. 1101–3, Division Rule XIV(P)(2)(b). The Rule requires that for claimants adjudicated indigent, the employer or the employer's insurance carrier must advance the cost of the DIME. However, the cost must be reimbursed by the claimant when a final order is issued, a final admission of liability is uncontested, or the parties settle the case on a full and final basis. See Division Rule XIV(P)(2)(d).

The district court relied on the Division's new rule to deny Smith's motion for a permanent

The state appealed the district's court judgment declaring the fee provisions unconstitutional as to the class of indigent claimants directly to this court. We now affirm the district court and hold that the fee provisions are unconstitutional under the due process clause of the Fourteenth Amendment. We do not reach the equal protection issue because our holding invalidating the fee provisions on due process grounds disposes of this case.

## III. COLORADO'S WORKERS' COMPENSATION ACT

To explain the full ramifications of the fee requirement and how it operates to deny a particular class of claimants—those indigent claimants unable to pay the $675 fee for a DIME—their constitutional rights to due process, we provide a brief overview of Colorado's Workers' Compensation Act.

The General Assembly created the substantive right to workers' compensation. *See Allison v. Indus. Claim Appeals Office*, 884 P.2d 1113, 1119 (Colo.1994). The substantive right to workers' compensation replaced an injured worker's common law right to sue. *Id.* Colorado's Workers' Compensation Act, §§ 8–40–101 to 8–47–209, is a mutual renunciation of common law tort claims and defenses in favor of a no-fault system and reduced but guaranteed benefits. *Kandt v. Evans*, 645 P.2d 1300, 1302 (Colo.1982); *see also* 1 Arthur Larson and Lex Larson, *Larson's Workers' Compensation Law* § 1.01 (2002). In essence, the Act is the exclusive remedy for workers injured within the scope and course of their employment. *See* § 8–41–102.

Following an injury covered by the Act, the insurance carrier or a self-insured employer must file and serve on the worker either a general admission of liability, in which it admits liability for the injury, or a notice of contest. § 8–43–203(1)(a); Division Rule IV(A). When such a general admission is served, the employer must compensate the injured employee in two ways. First, the employer must provide the employee with temporary total disability benefits, which are designed to be a partial substitute for lost wages or impaired earning capacity arising from a compensable injury.[8] §§ 8–42–105; *see also Safeway Stores, Inc. v. Husson*, 732 P.2d 1244, 1245 (Colo.App.1986). Second, the employer must provide the employee with medical treatment to cure and to relieve the employee from the effects of the injury. *See* § 8–42–101(1)(a). Although the Act obligates the employer to provide treatment, the employer and its insurer have the statutory right to designate the worker's authorized treating physician if they do so at the time the injury is first reported. § 8–43–404(5)(a).

The authorized treating physician for the injured worker, selected by the employer, plays a critical role in determining how long the worker will receive temporary disability benefits and medical treatment. In particular, the worker's temporary total disability benefits and medical treatment automatically terminate if the treating physician determines that the claimant has reached MMI.[9] *See* §§ 8–42–105(3), 8–40–201(11.5). Thus, if the injured worker's treating physician determines that the worker has reached MMI, the worker's temporary disability benefits and medical treatment end immediately.

Once the treating physician determines that the injured worker has reached MMI, the physician is required to determine whether the worker has sustained a permanent medical impairment, and if so, to what degree. § 8–42–107. The treating physician

injunction, filed shortly after the court found the original fee provisions unconstitutional. The district court denied injunctive relief because Smith failed to establish the requisite degree of impending harm. Neither the constitutionality of the new rule nor the district court's denial of Smith's motion for injunctive relief has been appealed to us and therefore we express no opinion on either issue.

8. TTD benefits are calculated so that an employer pays the employee two-thirds of his average weekly wage, up to a maximum rate of ninety-one percent of the state average weekly wage in effect on the date of the injury. *See* § 8–42–105(1).

9. The treating physician may determine that post-MMI treatment is necessary to maintain MMI or to alleviate pain and suffering. *Grover v. Indus. Comm.*, 759 P.2d 705, 710 (Colo.1988). However, Smith's treating physician denied post-MMI treatment.

may determine that there is a non-scheduled impairment or that there is no permanent impairment to an injured body part which is not on the schedule.[10] In some instances, the treating physician determines that the worker suffered an impairment, but it was not caused by an on-the-job injury. *Egan v. Indus. Claim Appeals Office,* 971 P.2d 664, 665 (Colo.App.1998)("Whether a particular component of the claimant's overall medical impairment was caused by the industrial injury is an inherent part of the rating process. . . .").

The consequences of the worker's impairment rating are financially significant because it determines how permanent medical impairment benefits are calculated. *See* § 8–42–107(8)(e); *Colorado AFL–CIO v. Donlon,* 914 P.2d 396, 401 (Colo.App.1995). Such permanent benefits are calculated by multiplying the percentage impairment rating by a statutory age factor and by 400 weeks and the temporary total disability rate. Permanent benefits are currently paid on a weekly basis at the minimum rate of $150 and the maximum rate of fifty percent of the state average weekly wage. § 8–42–107(8)(d). The maximum permanent rate may thus be less than the worker was receiving in weekly temporary total disability benefits.

■ The only way for an injured worker to challenge the treating physician's findings—including MMI, the availability of post-MMI treatment, degree of non-scheduled impairments, and whether the impairment was caused by an on-the-job injury—is to pay $675 for a DIME. §§ 8–42–107(8)(b)(II); 8–42–107(8)(c); 8–42–107.2(5), Division Rule XIV(L)(4). Under the statutory scheme and the implementing regulation, payment for a DIME is a mandatory, jurisdictional prerequisite to challenge the termination of temporary disability benefits and medical treat-

ment in a hearing before an administrative law judge. *See Story v. Indus. Claim Appeals Office,* 910 P.2d 80, 82 (Colo.App.1995); *Egan,* 971 P.2d at 665. There is no provision in the Act which allows this cost to be waived or shifted to the insurer for any reason.[11]

Thus, indigent claimants who cannot afford the fee will never obtain the benefit of an independent evaluation of their medical condition or, as a result, a determination of whether the termination of their temporary benefits and medical treatment was appropriate. Indeed, the General Assembly created the DIME system within the statutory scheme because of the potential for treating physicians to be biased in favor of the employer and the insurer. *See Colorado AFL–CIO,* 914 P.2d at 402.

The Division's statistics tracking claimants who challenged their MMI rating with a DIME establish this potential for bias. During 1999, 749 out of 2501 applications, or twenty-nine percent, resulted in reversal of the treating physician's determination. A similar reversal rate occurred in 2000, where the number of reversals was 654 out of 2056 applications, or thirty-one percent. This means that approximately three out of ten injured workers, or thirty out of a hundred, have had temporary disability benefits and medical treatment terminated prematurely and inaccurately by employer-selected treating physicians.

Those claimants with the ability to pay the mandatory fee ($675) possess the opportunity to challenge the findings of the treating physician with a DIME in a hearing before an administrative law judge, while those like the certified class do not. The consequences of a DIME are considerable. The independent medical examiner's opinions must be accorded "deference" at the administrative hearing by the administrative law judge. The

---

10. Scheduled impairments include injuries to the hand, arm, foot, leg, loss of vision, and deafness. *Duran v. Indus. Claim Appeals Office,* 883 P.2d 477, 479 (Colo.1994).

11. Section 8–43–502(3) concerning the utilization review process does not imply such a waiver or allow a shifting of the fee from the claimant to the employer. The utilization review process is designed to address treatment disputes, not the treating physician's determination of MMI or de-

gree of impairment. *See* § 8–43–501(1); *Colorado Comp. Ins. Auth. v. Nofio,* 886 P.2d 714, 716–17 (Colo.1994). Thus, like the district court, we reject defendants' argument that section 8–43–502(3) can be read so as to avoid the constitutional issues presented by the fee requirement found in sections 8–42–107(8)(b)(II), 8–42–107(8)(c), 8–42–107.2(5) and Division Rule XIV(L)(4).

DIME's findings can only be rejected by the administrative law judge if the challenging party proves them inaccurate by "clear and convincing evidence." §§ 8–42–107(8)(b)(III), 8–42–107(8)(c). Paying for a DIME enables the worker to challenge the accuracy of the treating physician's ratings and treatment recommendation not only before an administrative law judge, but also to appeal the results of this evidentiary hearing to the Industrial Claim Appeals Office, *see* § 8–43–301(8), and ultimately to the court of appeals. *See* § 8–43–307.

Unlike those claimants who can pay the fee, those who cannot because they are indigent possess no statutory process to challenge the accuracy of the treating physician's determinations by hearing and appeals to the Industrial Claim Appeals Office and the court of appeals. Thus, as a direct consequence of their inability to pay, indigent claimants are not afforded the opportunity to challenge the denial of their temporary disability benefits and medical treatment before an administrative law judge, the Industrial Claim Appeals Office or the courts.

## IV. PROCEDURAL DUE PROCESS

Having described the relevant provisions of the Workers' Compensation Act, we discuss Smith's claim that the fee requirement found in sections 8–42–107(8)(b)(II), 8–42–107(8)(c), 8–42–107.2(5), and Division Rule XIV(L)(4) violate the due process clause.

■ Procedural due process imposes constraints on governmental decisions which deprive individuals of property interests within the meaning of the Due Process Clause of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To decide whether the fee requirement in the Act and the implementing regulation violates indigent claimants' constitutional guarantees to procedural due process, we must determine whether indigent claimants possess property interests protected by the Due Process Clause, and if so, whether the fee requirement unconstitutionally deprives this particular group of claimants of their property interests.

## A. Indigent Claimants, Like All Workers' Compensation Claimants, Have Statutorily Created Property Interests In The Continued Receipt Of Temporary Disability Benefits And Medical Treatment

■ Property interests, protected by the Constitution, are created and defined by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The United States Supreme Court has found property interests in the continued receipt of government benefits when they are created and defined by statute. *See Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare recipients have a property interest in welfare payments that was grounded in the statute defining their eligibility); *Mathews*, 424 U.S. at 332, 96 S.Ct. 893 (interest of an individual in continued receipt of social security disability benefits is a statutorily created property right); *Walters v. Nat'l Assoc. of Radiation Survivors*, 473 U.S. 305, 307, 320, 332, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985)(interest of veterans in continued receipt of service-connected death and disability benefits is a statutorily created property interest).

■ Here, the Workers' Compensation Act creates and defines such property interests for injured workers in Colorado. The General Assembly created the substantive right to workers' compensation. *See Allison*, 884 P.2d at 1119. The substantive right to workers' compensation is a constitutionally protected property interest. *Id.; Donn v. Indus. Claim Appeals Office*, 865 P.2d 873, 875 (Colo.App.1993); *Colorado Comp. Ins. Auth. v. Nofio*, 886 P.2d 714, 719 (Colo.1994). For injured workers in Colorado, the Act secures certain benefits and supports claims of entitlement to those benefits. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. Once the employer admits liability, the Act entitles the claimant to property interests that include temporary benefits and medical treatment. Thus, after liability is determined, Smith and the

class he represents possess statutorily created property interests in the continued receipt of disability benefits and medical treatment.

## B. The Fee Requirement Denies Indigent Claimants A Meaningful Opportunity To Be Heard In A Meaningful Manner Before The State Deprives Them Of Their Property Interests

Once a property interest has been established by statute, as is the case here, the Fourteenth Amendment constrains the government from depriving people of their property interest without due process. *See, e.g., Nofio,* 886 P.2d at 719 ("A claimant who has been awarded benefits in a workers' compensation case is entitled to procedural due process before those benefits may be terminated.") (citations omitted).

Before turning to the specific requirements of federal due process, however, it is important to note at the outset that our due process analysis does not address a fundamental right to meaningful access to the courts, *see, e.g., Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)(holding that the government had an affirmative obligation to provide prisoners with law libraries and supplies that would facilitate their fundamental right of access to the courts); *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)(limiting the scope of *Bounds* but reaffirming that there is a constitutional right of access to the courts), or any other fundamental rights that would require a waiver of court fees for indigent litigants.[12] *See, e.g., Boddie v. Connecticut,* 401 U.S. 371, 374, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)(holding that it was unconstitutional to deny indigent individuals access to the courts for filing a divorce petition because of their inability to pay); *M.L.B. v. S.L.J.,* 519 U.S. 102, 107, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996)(declaring unconstitutional a state requirement that parents pay a fee for preparation of the trial record to appeal a termination of custody).

The DIME fee is not a general filing fee that prevents indigent claimants from litigating their claims in court. As discussed, no workers' compensation claimants can litigate their injury claims in civil proceedings. *See Kandt,* 645 P.2d at 1302. Our due process analysis is limited to Colorado's Workers' Compensation Act and the specific administrative and judicial regime of review under the Act that the state has created to ensure that workers are not prematurely denied temporary disability benefits and medical treatment. Thus, the question before us is not whether indigent claimants enjoy "equal access to the courts," but rather whether the DIME fee prohibits indigent claimants from exercising their right to administrative and judicial review of adverse decisions by the treating physician, as provided by the Act. Keeping the limits of our analysis in mind, we turn to a discussion of due process.

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (citing *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). However, this fundamental requirement of due process is not fixed or rigid. "[T]he process required by [the Due Process Clause] with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstance under which the deprivation may occur." *Walters,* 473 U.S. at 320, 105 S.Ct. 3180; *see also Cafeteria and Rest. Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

To determine whether the flexible requirements of due process are satisfied, a court must analyze the affected private and government interests by weighing three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the

---

**12.** Because the class of indigent claimants challenged the DIME fee under the Fourteenth Amendment of the United States Constitution, we do not analyze the right of workers' compensation claimants to access to the courts under article II, section 6 of the Colorado Constitution. *See Allison,* 884 P.2d at 1119.

government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

In light of the private and governmental interests at stake here, and the nature of the statutory scheme that denies any administrative or judicial review of the treating physician's determinations for indigent claimants, we hold that the fee requirement unconstitutionally denies these claimants any opportunity to be heard before they are deprived of the continued receipt of temporary disability benefits and medical treatment. To explain our reasoning, we turn to a discussion of each *Mathews* factor.

### 1. Private Interest

██ First, one of the important factors to consider when evaluating the nature of the private interest that will be affected by official action is the "degree of potential deprivation." *Id.* at 341, 96 S.Ct. 893. For example in *Goldberg*, the Supreme Court emphasized that welfare benefits are given to persons on the very margin of subsistence:

> The crucial factor in this context ... is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits.

397 U.S. at 264, 90 S.Ct. 1011 (emphasis omitted). As a result, the United States Supreme Court found a high degree of deprivation when welfare benefits were terminated. *Id.* at 265, 90 S.Ct. 1011. In later cases, the Supreme Court distinguished the degree of deprivation when the state terminated disability benefits because those benefits, unlike welfare benefits, were not based upon financial need. *See Mathews*, 424 U.S. at 342, 96 S.Ct. 893; *Walters*, 473 U.S. at 307, 333, 105 S.Ct. 3180.

Here, although the deprivation involves disability benefits and medical treatment, the situation is more analogous to *Goldberg* because there is a high degree of potential deprivation when TTD benefits are terminated. Under the Act, eligibility for TTD benefits and medical treatment are not dependent on financial need, but indigent claimants like Smith are persons on the margin of subsistence.

Indeed, as a result of the treating physician's MMI determination, Smith's benefits were dramatically reduced from $305.39 per week (temporary total disability benefits) to a mere $120 per week (permanent disability benefits). As a result, indigent claimants like Smith would be forced to decide between spending over a month's worth of disability benefits on necessities such as food or rent or obtaining an independent medical examination, which now costs $675.

Justice Thurgood Marshall aptly characterized the plight of Smith and his class members who live on the margin of financial survival:

> [N]o one who has had close contact with poor people can fail to understand how close to the margin of survival many of them are. A sudden illness, for example, may destroy whatever savings they may have accumulated, and by eliminating a sense of security may destroy the incentive to save in the future. A pack or two of cigarettes may be, for them, not a routine purchase but a luxury indulged in only rarely. The desperately poor almost never go to see a movie ... [t]hey have more important things to do with what little money they have."

*United States v. Kras*, 409 U.S. 434, 460, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973)(Marshall, J., dissenting).

The devastating decline in benefits—directly caused by the treating physician's determination of MMI—is not unusual. About fifty percent of injured workers receiving TTD benefits must live on a subsistence income—$15,184 a year, which is less than one-quarter of the state median income.[13] Even if these workers manage to live on their TTD benefits, the MMI determination triggering

---

**13.** In 1998, the Federal Poverty Level for a family of four was $16,450. These figures mean that for fifty percent of the injured workers with a spouse and two or more children, their TTD benefits place them below the Federal Poverty Level unless there is an additional source of income.

an automatic reduction in benefits and the termination of treatment can be financially disastrous for indigent workers and their families. Thus, considering the financial situation of the class of indigent claimants before us, we conclude that there is a high degree of hardship imposed by the termination of temporary disability benefits and treatment.[14]

## 2. Nature of the Process and the Risk of Erroneous Deprivation

Next, we turn to whether the Act's procedure creates a risk of an erroneous deprivation or an inaccurate termination of indigent claimants' property interests and the probable value, if any, of additional or substitute procedural safeguards. Central to this inquiry is the nature of the relevant administrative process. *Mathews*, 424 U.S. at 343, 96 S.Ct. 893. In *Mathews*, for instance, there existed carefully structured procedures that protected a claimant's disability benefits from unconstitutional termination and thus the Court held that additional procedures were unnecessary. *Id.* at 349, 96 S.Ct. 893.

In *Mathews*, before a claimant's disability benefits could be initially terminated, a state agency team—consisting of a physician and a non-medical person trained in disability evaluation—investigated. *Id.* at 337, 96 S.Ct. 893. The investigation team communicated with the disabled worker and requested detailed information about his assessment of his own condition. *Id.* The team also requested information from the claimant's treating physician. If there was a conflict between the information provided by the beneficiary and the information obtained from the treating physician, the team could arrange for an examination by an independent consulting physician. Whenever the team's initial assessment of the beneficiary's condition differed from the beneficiary's own assessment, the beneficiary was informed that benefits could be terminated, provided a summary of the evidence upon which the proposed determination to terminate was based, and afforded an opportunity to review the medical reports and other evidence in the case file. The beneficiary could also respond in writing and submit additional evidence. *Id.* at 337–38, 96 S.Ct. 893. Overall, prior to the initial termination of benefits, a recipient could always submit new evidence regarding disability and such submissions could result in additional medical examinations.

Considering this elaborate process that afforded claimants an opportunity to be heard prior to the termination of benefits, the Supreme Court in *Mathews* noted, not surprisingly, that the overall reversal rate was only three percent. *Id.* at 346, n. 29, 96 S.Ct. 893.

In comparison, the nature of the relevant administrative process for indigent claimants under the Colorado Workers' Compensation Act stands in stark contrast. The fee requirement prohibits indigent claimants from *any* opportunity to be heard in front of an impartial adjudicator regarding the decisions of the treating physicians. The Act provides indigent claimants no opportunity to be heard—let alone a "meaningful opportunity"—because of the imposition of a fee for the DIME. For a special group of injured workers, those who are indigent, the decision of the treating physician is final and irrevocable. This group gets no opportunity for an independent evaluation, no benefit of the statutory presumptions accorded to this evaluation, no administrative hearing, no administrative appeal, and no right to appeal to our court system.

Because indigent claimants are foreclosed from any administrative or judicial review of the denial of their claims, the risk of erroneous deprivations—or the inaccurate decisions to terminate their property interests—is substantial. As discussed earlier, the reversal rate for the treating physician's determination of MMI is approximately thirty percent. In effect, thirty out of a hundred injured workers have had temporary disability bene-

---

14. Even in *Mathews*, the question before the Supreme Court was what process was due prior to the "initial termination" of benefits pending a review. 424 U.S. at 333, 96 S.Ct. 893. The claimants in *Mathews* suffered only a temporary termination of benefits with the possibility that their benefits would be reinstated. For indigent claimants under Colorado's Workers' Compensation Act who cannot afford the DIME fee, there is a permanent termination of TTD benefits and medical treatment with no opportunity for review and reinstatement.

fits and medical treatment terminated prematurely or unnecessarily by employer-selected treating physicians. Such a high rate of erroneous terminations of benefits and treatment is significant in assessing whether the process afforded indigent claimants is constitutionally valid. *See Mathews*, 424 U.S. at 346, 96 S.Ct. 893 (overall reversal rate was only three percent); *Walters*, 473 U.S. at 327, 331, 105 S.Ct. 3180 (holding that a statutory fee limitation for lawyers representing veterans challenging the termination of benefits was constitutional because, among other things, the overall reversal rate for agency decisions was only sixteen percent and the success rate for veterans with representation was, at most, only three percent better than claimants without representation); *see also United States Dep't of Labor v. Triplett*, 494 U.S. 715, 726, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990)(reviewing the constitutionality of the Black Lung Benefits Act of 1972 prohibiting attorneys' fees for representing claimants but not reaching the due process question because there was no showing that the Act prevented individuals from securing legal representation).

Beyond peradventure, the additional procedures granted to those who can afford to pay the DIME fee would ensure that indigent claimants received due process and would reduce the risk of erroneous deprivations or inaccurate decisions curtailing injured claimants' statutory property interests. The opportunity to obtain a medical evaluation, to have a hearing before an administrative law judge, to have the benefits of the statutory preferences accorded such a medical evaluation, and to have this decision reviewed on appeal both administratively and in the courts are statutory rights provided to non-indigent claimants. If these rights were afforded to indigent claimants, this particular group would unquestionably have an oppor-

tunity to be heard at a meaningful time and in a meaningful manner and thereby due process concerns would be satisfied.

### 3. Government Interest

The final factor to be assessed is the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 347, 96 S.Ct. 893. The most visible burden on the government would be either the cost associated with a fee waiver for indigent claimants or the introduction of additional procedures that would afford indigent claimants due process.[15] Without explanation and empirical support, the state argues that the fiscal and administrative burdens of an evidentiary hearing would be substantial. However, the Act already provides an evidentiary hearing before an administrative law judge for those with the ability to pay for a DIME. Because no information has been supplied, it is unclear how providing evidentiary hearings to indigent claimants to protect their statutory property rights imposes additional costs or burdens.

 Even so, financial and administrative burdens alone are not the controlling weight in determining whether due process is adequately afforded. *Id.* at 348, 96 S.Ct. 893. Indeed, we are not persuaded that any government burdens, real as they might be, should outweigh the interests of indigent claimants who disproportionately suffer the termination of temporary disability benefits and medical treatment without any opportunity to be heard before an impartial adjudicator. *Goldberg*, 397 U.S. at 266, 90 S.Ct. 1011.

In sum, after weighing the respective private and public interests, we hold that the fee requirement found in sections 8–42–107(8)(b)(II), 8–42–107(8)(c), 8–42–107.2(5), and Division Rule XIV(L)(4)—by requiring

---

**15.** In *Neff v. Comm'r of the Dep't of Indus. Accidents*, 421 Mass. 70, 653 N.E.2d 556, 558 (1995), for example, the Massachusetts Supreme Judicial Court considered its own workers' compensation scheme that required claimants to pay a fee as a jurisdictional prerequisite before they could challenge adverse decisions at an evidentiary hearing. Although the majority did not reach the constitutional procedural issue, the dissent reasoned that Massachusetts' scheme was constitu-

tional as it applied to indigent workers because all claimants were afforded an opportunity to be heard, prior to the imposition of a fee, at an informal conference before an administrative law judge. *Id.* at 564 (O'Connor, J. dissenting). The conference included a memorandum of issues in dispute, exhibits, witnesses, and any other such information as may be allowed or required. *Id.* at 563.

indigent workers to prepay a fee before they can obtain either administrative or judicial review of adverse decisions of a treating physician—violates the procedural due process guarantee of the Fourteenth Amendment. As a result, the state must either waive the DIME fee for indigent claimants or introduce additional procedures for such claimants that guarantee them an opportunity to be heard at a meaningful time and in a meaningful manner prior to the termination of their disability benefits and medical treatment. This result, mandated by federal due process concerns as set forth in *Mathews* is consistent with our own precedent concerning administrative and judicial review of the termination of injured workers' benefits and treatment. *See, e.g., Allison,* 884 P.2d at 1119; *Nofio,* 886 P.2d at 719.

## V. CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.

Justice COATS concurs in the judgment only.

Justice COATS, concurring in the judgment only.

While I agree with the district court that the workers' compensation regulatory scheme sanctions a taking of the plaintiffs' property without due process of law, I would reach that conclusion in a different way, and I would firmly reject the district court's conclusion that the scheme violates equal protection.[1] Furthermore, I cannot agree with the majority rationale holding the scheme unconstitutional only as applied to indigent claimants, which I find to be, at one and the same time, both too broad and too narrow. By requiring expenses that fall neutrally upon everyone seeking a hearing to be advanced to indigents solely because of their current inability to pay, the majority implicitly interprets the Due Process Clause of the Fourteenth Amendment in a way that I believe has been steadfastly rejected by the United States Supreme Court. At the same time,

however, by limiting its rationale to the advancement of costs to indigents, the majority, in my view, fails to identify the actual due process shortcoming of the scheme or protect adequately the due process rights of dissatisfied claimants. Because I am concerned about the broad implications of the majority's rationale, not only as it impacts those who lack, but also those who arguably possess, the ability to meet statutory preconditions for access to judicial or quasi-judicial process, I write separately to express my views.

## I. As Applied to Indigent Claimants

The critical assumption of the majority's rationale (for which I find no adequate explanation or justification) is that the statutory requirement for a challenging party to make advanced payment for an independent medical examination ("IME") is valid except to the extent that it falls upon an indigent claimant; and when enforced against an indigent claimant, it is invalid, even though the interest at stake is not of a particularly fundamental nature and the claimant is not adversely affected by membership in a protected class. To be sure, the Supreme Court has held that a statute or rule may be constitutionally invalid as applied when it operates to deprive an individual of a protected right, although its general validity as a measure enacted in the legitimate exercise of state power is beyond question. *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). More particularly, a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard. *Id.* at 380, 91 S.Ct. 780. But the Supreme Court has never suggested that conditioning the basic right to be heard in defense of one's property on the payment of a fee is valid, regardless of ability to pay; and the Court has been extremely circumspect in requiring a waiver of otherwise valid fees for indigents in civil cases, making clear that such a requirement is the exception rather than the general rule.

---

**1.** Unlike the majority, I understand the district court to have declared sections 8–42–107(8)(b)(II), (8)(c), and 107.2(5), 3 C.R.S. (2000), as well as Rule XIV(L) of the Department

of Labor & Employment Rules, facially unconstitutional because of their effect on indigent claimants—not merely unconstitutional as applied to indigent claimants.

In numerous cases, the Supreme Court has held that government "need not provide funds so that people can exercise even fundamental rights," *see M.L.B. v. S.L.J.*, 519 U.S. 102, 124–25, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), and that the Constitution " 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.' " *Id.* at 125, 117 S.Ct. 555 (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Holding, however, that "access to judicial processes in cases criminal or 'quasi-criminal in nature' " may not turn on ability to pay, *id.* at 123, 117 S.Ct. 555 (quoting *Mayer v. Chicago*, 404 U.S. 189, 196, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971)), the Court has recognized a narrow category of civil cases in which the State must provide access to its judicial processes without regard to a party's ability to pay court fees. *Id.* at 113, 117 S.Ct. 555 (citing *Boddie*, 401 U.S. at 379, 91 S.Ct. 780).[2] Although a " 'precise rationale' has not been composed," *id.* at 120, 117 S.Ct. 555 (quoting from *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)), the Court's decisions concerning access to judicial processes reflect both equal protection and due process concerns, the former relating to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs and the latter homing in on the essential fairness of the state-ordered proceedings anterior to adverse state action. *Id.*

These mixed due process/equal protection concerns are addressed by the majority mechanically in terms of the due process balancing test. Apart from the defense of criminal charges, the Supreme Court has invoked procedural due process as a basis for requiring the funding of indigents only to provide them meaningful access to the courts where necessary to preserve important associational rights involving choices about marriage, family life, and the upbringing of children. *Id.*

at 116. Carefully limiting its rationale to the cases before it, *see, e.g., Boddie*, 401 U.S. at 382, 91 S.Ct. 780 ("[W]e wish to re-emphasize that we go no further than necessary to dispose of the case before us . . . ."), the Court has required the government to provide indigents with transcripts, *M.L.B.*, 519 U.S. at 128, 117 S.Ct. 555, and even attorneys, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), in certain, complex termination of parental rights proceedings. It has required the state to pay for blood grouping tests sought by an indigent defendant where those tests were the only realistic way for him to contest a state-motivated paternity suit. *Little v. Streater*, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981). It has even prohibited the denial of access by indigents to the state process for dissolving marriage, characterizing it as "the exclusive precondition to the adjustment of a fundamental human relationship." *Boddie*, 401 U.S. at 383, 91 S.Ct. 780.

By contrast, however, the Supreme Court has distinguished the assessment of filing fees in bankruptcy proceedings, *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), and appeals from the denial of welfare benefits, *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973), finding that bankruptcy discharge and increased welfare payments have "far less significance," *id.* at 659, 93 S.Ct. 1172, and do "not rise to the same constitutional level." *Kras*, 409 U.S. at 445, 93 S.Ct. 631. Ranking these prescriptions with economic and social welfare legislation generally, *see M.L.B.*, 519 U.S. at 115 n. 7, 117 S.Ct. 555, the Court has found no " 'fundamental interest . . . gained or lost depending on the availability of the relief sought by [the complainants].' " *Id.* at 115, 117 S.Ct. 555 (quoting *Ortwein*, 410 U.S. at 659, 93 S.Ct. 1172). That being the case, the Court found no due process requirement for the accommodation of those who were incapable of paying the filing fees in those instances.

2. I understand the Court's use of the term "judicial processes" to include not only the process of courts of law but also quasi-judicial or administrative process. *See Boddie*, 401 U.S. at 375, 91 S.Ct. 780 ("It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement.").

The monetary interests at stake in a workers' compensation claim, like the property interests at stake in bankruptcy proceedings and welfare claims, are clearly not among the basic associational rights involving familial relations that have been "set apart," *id.* at 116, 93 S.Ct. 1172, by the Court. *Cf. Indus. Claim Appeals Office v. Romero,* 912 P.2d 62, 66 (Colo.1996) (receipt of workers' compensation benefits not a fundamental right for purposes of equal protection analysis) (citing *Duran v. Indus. Claim Appeals Office,* 883 P.2d 477, 482 (Colo.1994)); *Yonikus v. Indus. Comm'n,* 228 Ill.App.3d 333, 169 Ill.Dec. 386, 591 N.E.2d 890, 893 (1992) (right to judicial review of workers' compensation decision is not fundamental and is not essential to basic notions of due process). In the absence of such a "fundamental interest," or "important associational right," the Due Process Clause of the Fourteenth Amendment simply does not mandate the waiver of otherwise acceptable costs or fees for civil indigents.

Similarly, in terms of the Equal Protection Clause, "the general rule, stated in *Ortwein,* [is] that fee requirements ordinarily are examined only for rationality," and "[t]he State's need for revenue to offset costs, in the mine run of cases, satisfies the rationality requirement." *M.L.B.,* 519 U.S. at 123, 117 S.Ct. 555; *see also Ortwein,* 410 U.S. at 660, 93 S.Ct. 1172; *Kras,* 409 U.S. at 446, 93 S.Ct. 631; *Culver v. Ace Elec.,* 971 P.2d 641, 646 (Colo.1999) (applying rational basis standard to claim that workers' compensation act violated equal protection); *Pace Membership Warehouse v. Axelson,* 938 P.2d 504, 506 (Colo.1997) (same); *Romero,* 912 P.2d at 66 (same). Filing fees in actions that do not involve fundamental interests or rights have been invalidated only when found to be irrational by serving no purpose other than to deter resort to the courts. *See Lindsey v. Normet,* 405 U.S. 56, 63–64, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (invalidating double bond that imposed substantial barrier to appeal by evicted tenants, *whether indigent or not,* and discriminated against a particular class of litigants, where it was "unrelated to actual rent accrued or to specific damage sustained by the landlord," and bore no reasonable relationship to any valid state objective). Where there is any reasonably conceivable set of facts that could provide a rational basis for the fee requirement, however, it must be upheld. *See Bankers Life and Cas. Co. v. Crenshaw,* 486 U.S. 71, 83–85, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) (upholding state statute imposing 15% penalty against persons who appealed unsuccessfully from money judgments because it did not single out a narrow class of parties but applied to all money judgments; was reciprocal in that it applied to both plaintiffs and defendants; and was not so great as to bear no rational relationship to its goal of discouraging frivolous appeals); *see also Fed. Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Christie v. Coors Transp. Co.,* 933 P.2d 1330, 1333 (Colo.1997) ("If any conceivable set of facts would lead to the conclusion that a classification serves a legitimate purpose, a court must assume those facts exist.").

Although different procedures could unquestionably have been devised for challenging the treating physician's findings under Colorado's workers' compensation regulatory scheme, the requirement for an IME is clearly rational and arguably insures that the ultimate decision will rest on highly reliable evidence. Requiring the party seeking the exam to pay for it is an even-handed and rational way to allocate costs, both to insure compensation for the private physicians who perform the exams and to dissuade parties from resorting to expensive reexaminations without justification. There is no suggestion that the fee prescribed by rule is excessive or unrelated to the actual costs of the exam. While the practical effect of the rule may be to make challenges more burdensome, and in some cases perhaps even prohibitively so, much like the filing fees in *Kras* and *Ortwein,* such an effect resulting from the economic circumstances of particular claimants in no way renders the rule irrational or illegitimate.

As the majority notes, the due process test is flexible, requiring consideration of the private interest that will be affected by official action, the risk of an erroneous deprivation of that interest through the use of existing procedures and the probable value of addi-

tional or substitute procedural safeguards, and the government's interest in adhering to the existing system. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). But the Supreme Court has consistently cautioned that "[i]n applying this test we must keep in mind, in addition to the deference owed to Congress, the fact that the very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and citing *Parham v. J.R.*, 442 U.S. 584, 612–13, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)). By measuring the adequacy of the statutorily afforded process according to its operational effect on particular individuals, based on their current difficulty paying for an IME, I fear the majority not only misconstrues the controlling precedent of the Supreme Court but also opens a floodgate.

The statutory provision is facially neutral, and the majority does not suggest that it is irrational or designed to exclude indigents. Nor does the majority find the existing procedures inadequate because a large percentage of claimants are too poor to take advantage of their hearing provisions.[3] Rather the majority concludes, virtually without discus-

sion or explanation, that whenever a claimant's individual financial situation would make the cost of an IME too burdensome for him,[4] the state must be considered to have denied that claimant a hearing, in violation of the dictates of procedural due process. Since the majority's holding is independent of the particular interest at stake or constitutionally protected characteristics of the claimant, it presumably extends to anyone who is unable, for reasons involving his personal circumstances, to take advantage of judicial or administrative process statutorily provided to dispute the deprivation of his property. At the very least, however, it is clear that the majority would consider the personal financial limitations of particular individuals in determining the adequacy of process neutrally afforded all those similarly situated and to the extent that it were found to be inadequate for indigents, require the state to either waive prepayment requirements or provide additional or substitute process solely for them.[5]

At least as significantly, the majority's solution fails to address, and appears to sanction, the imposition of financial burdens like the one in this case, on the resort to judicial or quasi-judicial process in defense of one's property. Its holding prohibits only the conditioning of access to process upon payment *in advance*. Nowhere does the majority suggest that imposing the cost of an IME on even indigent claimants would offend due process, as long as they are entitled to a hearing *before* being required to make pay-

---

3. While no statistics concerning the percentage of claimants denied a hearing because of indigency were available, Whiteside's affidavit indicated that she had only encountered two or three cases (including the present case) in which a claimant seeking indigency status had asked to have the IME fee waived. Interestingly, Whiteside's affidavit also indicated a yearly average of approximately 40,000 claims, suggesting a known reversal rate for all MMI findings of less than 3%, as contrasted with the 30% of *challenged* MMI findings, considered significant by the majority. *See* maj. op. at 1250–1251.

4. The majority intends Chief Justice Directive 98–01, which sets standards of wealth and income, to be used to determine when financial status will require the waiver of court filing and service fees in civil cases. *See* maj. op. at 1242, n. 1. Interestingly, by its own terms, CJD 98–01

does not permit the waiver of expert witness fees in any event.

5. I am aware of the majority's attempt to limit the effect of its holding to the Workers' Compensation Act. Maj. op. at 1248. I can, however, decipher no principled basis for such a limitation unless the majority merely intends to indicate that the outcome of the due process balancing process in this case is limited to the particular rights and procedures of the workers' compensation regulatory scheme balanced here. While that would seem to be clear enough, it in no way limits the general principle to which the majority subscribes—that the *Mathews* balancing test requires consideration of the ability of particular individuals to take advantage of neutrally provided process in determining whether it is adequate for them.

ment. Whether indigent or not, under this rationale a claimant may be legitimately denied any opportunity to challenge the taking of his property if he is unwilling to incur the additional expense of an IME. And for aught that appears in the majority's opinion, this remains true whether or not he is ultimately vindicated by demonstrating that the treating physician's findings were wrong.[6] I see little difference between erroneously depriving someone of his property because he is unable to pay in advance, on the one hand, and erroneously depriving someone of his property because he is unwilling to incur a debt that is burdensome beyond his means, on the other. I find it ironic that the majority is willing to extend the demands of procedural due process to accommodate indigent economic or social welfare claimants but is unwilling to provide them any greater relief than the guarantee of a loan they are unlikely to be able to repay.[7]

## II. Financial Burden on the Right to be Heard

Although I find no justification for the majority's special treatment of indigents in this context, I would nevertheless hold that the regulatory scheme violates the due process rights of any workers' compensation claimant whose benefits are curtailed or reduced by the findings of the treating physician, for the separate reason that it denies him any right to complain or be heard whatsoever, unless he produces, at his own expense, a separate, statutorily prescribed, expert opinion. I would hold that a person may not be deprived of his property by government action without being afforded some opportunity, despite being unable or unwilling to pay for it or to produce any evidence or witnesses other than himself, to object and be heard by a neutral decisionmaker.

A number of courts, in various contexts, have wrestled with the problem of imposing financial burdens or the risk of additional loss as a precondition to access to judicial or quasi-judicial process, quite apart from their operational effect on indigents. *See, e.g., California Teachers Assoc. v. California,* 20 Cal.4th 327, 84 Cal.Rptr.2d 425, 975 P.2d 622, 643 (1999) (invalidating statute requiring losing teacher to pay half the cost of administrative law judge as violation of due process on grounds "that any legitimate interest the state may have in conserving resources or discouraging hearings that happen to result in an administrative or judicial decision against a teacher does not outweigh the teacher's strong interest in presenting his or her own side of the case and in invoking the discretion of the adjudicator."); *Rankin v. Indep. Sch. Dist.,* 876 F.2d 838 (10th Cir. 1989) (invalidating statute requiring teacher to pay half cost of posttermination hearing on grounds that penalizing exercise of right to due process subjects statute to exacting judicial scrutiny and state lacked compelling interest); *Winston v. New York,* 759 F.2d 242 (2d Cir.1985) (invalidating statute requiring forfeiture of retirement contributions by teachers dismissed after hearing but not teachers resigning before hearing, on grounds that statute chilled teachers' procedural due process right to a hearing). Although no consistent theory has emerged, it seems clear that the imposition of a cost or additional risk of loss as a precondition to the exercise of a right to defend against governmental deprivation of one's property implicates constitutional guarantees of procedural due process.

Procedural due process imposes constraints on governmental actions that deprive individuals of life, liberty, or property within the meaning of the Due Process Clause of

---

**6.** The effect of limiting the holding as the majority does is of course not merely theoretical. Although not expressly challenged here, an emergency rule adopted immediately after the district court's initial order was the basis for its refusal to grant injunctive relief, even though the rule would merely provide for advancement of the IME fee, which would still have to be repaid, regardless of the outcome.

**7.** It is also more than a little ironic that if the class representative in this case had requested an IME at the time he filed his objection to the final admission, and for nearly a year thereafter, according to the Department of Labor and Employment Rules as they existed at that time, it appears he would have had the exam paid for by his employer's insurance carrier. *See* Dep't of Labor & Employment Rule XIV(L)(3)(h), 7 CCR 1101–3 (adopted May 20, 1992; sunset June 1, 1993).

the Fourteenth Amendment. *Mathews*, 424 U.S. at 332, 96 S.Ct. 893. The regulatory scheme at issue here does not merely have an effect that is in a realistic sense similar to forcing a claimant to defend his interests. *Cf. Boddie*, 401 U.S. at 376–77, 91 S.Ct. 780 ("Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court."); *Streater*, 452 U.S. at 10, 101 S.Ct. 2202 (stating that the Connecticut paternity proceedings at issue had quasi-criminal overtones). In light of the Supreme Court's jurisprudence placing the continued entitlement to a benefit among the property interests protected by the Due Process Clause,[8] the Colorado Workers' Compensation Act sanctions the actual deprivation of property and must therefore afford the process that is constitutionally due its defense.

Since 1991, however, Colorado's regulatory scheme has provided no opportunity for a claimant to be heard on the questions of maximum medical improvement and degree of impairment unless and until he can produce his own expert witness.[9] *See* ch. 219, sec. 15, § 8–42–107, 1991 Colo. Sess. Laws 1291, 1309–10. These determinations are initially made by the employer-selected, treating physician, and although termination of medical and temporary disability benefits are direct consequences of his findings, they are only subject to review by a neutral decisionmaker if the claimant procures, at his own expense, a separate and (as a practical matter) conflicting medical report, from a medical examiner who has been certified by the state for that purpose. The Colorado scheme not only charges the claimant a fee for the process constitutionally required to deprive him of his property; it actually requires him to produce evidence, from a state-certified expert and at a state-fixed price, before affording him an opportunity to respond in any way or demand justification for a decision depriving him of his property.

Perhaps because due process is a flexible concept that includes consideration of the fiscal and administrative burdens of particular procedures within its calculus, *see Mathews*, 424 U.S. at 335, 96 S.Ct. 893, the Supreme Court has never expressly identified minimum safeguards that must be provided without cost to an affected party. Its numerous statements about procedural due process, however, cannot be understood to require an opportunity to be heard only for those benefits recipients who are able and willing to pay for it. In the entitlement-to-benefits or so-

---

**8.** It is too well-settled to brook dissent that "property" within the meaning of the due process clause includes an interest that a person has already acquired in specific benefits. *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Watso v. Colorado Dep't of Soc. Servs.*, 841 P.2d 299, 305 (Colo.1992). I agree with the majority that a workers' compensation claimant, at least to the extent that his employer has admitted liability, has a property interest in continuing to receive medical and temporary disability benefits, but I would not dismiss with such short shrift the director's assertion that the entitlement continues only until the treating physician finds MMI. Ultimately, however, I would reject the director's argument because "property" within the meaning of the Due Process Clause cannot be defined by the procedures for its deprivation. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Supreme Court's recent holding in *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), finding no property interest by Pennsylvania workers' compensation claimants, is not to the contrary because it did not involve entitlement to a claim for payment, but merely a right to particular payments prior to resolution of disputes. *See id.* at 61 n. 13, 119 S.Ct. 977; *see also id.* at 62, 119 S.Ct. 977 (Ginsburg, J., concurring in part and concurring in the judgment) ("I do not doubt, however, that due process requires fair procedures for the adjudication of respondents' *claims* for workers' compensation benefits, including medical care.") (emphasis added).

**9.** The statutory scheme, as it existed prior to 1991, provided that the director and not the treating physician made the determination of whether the claimant reached MMI and his degree of permanent disability. *See A & R Concrete Constr. v. Lightner*, 759 P.2d 831, 833 (Colo.App. 1988) ("The sole fact that a physician gives a date of maximum medical improvement does not, in and of itself, mean that maximum medical improvement has indeed been attained.... Rather, this issue must be decided by the Director after the parties have had a full and fair opportunity to be heard."); *see also* § 8–42–110, 3B C.R.S. (1990 Supp.) (dictating that the director shall determine the claimant's percentage of permanent disability).

called "new property" context,[10] the Court has expressly held that such individuals have a "right" to be heard, *see Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701 ("When protected interests are implicated, the right to some kind of prior hearing is paramount."); *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ("The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions."), and that an opportunity to be heard must be "afforded," *see Boddie,* 401 U.S. at 379, 91 S.Ct. 780 ("[A] State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause."), or "given" to them, *see Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487 ("We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.")(quotation omitted); *Boddie,* 401 U.S. at 377, 91 S.Ct. 780 ("[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."); *Mathews,* 424 U.S. at 348, 96 S.Ct. 893 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' ") (quoting *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)).

It has repeatedly held that "some form of hearing" is required before deprivation of their property, *see Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) ("[I]t has become a truism that 'some form of hearing' is required before the owner is finally deprived of a protected property interest.") (quoting *Roth,* 408 U.S. at 570–71, 92 S.Ct. 2701); *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 ("This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest.") (citing *Wolff v. McDonnell,* 418 U.S. 539, 557–558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)), and that deprivation must be "preceded by" a hearing, *see Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487 ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' ") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

The language chosen by the Court unequivocally requires the availability of an "appropriate" hearing—not merely a hearing that would be appropriate if the recipient suffering a deprivation were actually willing (and able) to pay for it. Any financial burden imposed by the government upon the exercise of a right to be heard must, at the very least, be factored into the calculus of appropriateness. Whether or not the right to even the barest opportunity to respond could ever be conditioned upon a recipient's willingness to incur additional costs, it is at least clear that the risk of an erroneous deprivation must increase with the likelihood that the costs of otherwise beneficial procedural safeguards will limit resort to them, suggesting the need for additional or substitute procedures. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. While the Supreme Court may not have been directly faced with the imposition of a fee as a precondition to any right to be heard in defense of one's property, on occasion it has found the assessment of fees for certain additional or more elaborate procedures acceptable precisely because a sufficient administrative hearing, "not conditioned on payment of any fee," had already been provided. *Ortwein,* 410 U.S. at 660, 93 S.Ct. 1172 (filing fee upheld for judicial review of reduction in welfare payments where pretermination hearing had been provided without cost).

The cost upon which a hearing is conditioned in the workers' compensation regulatory scheme is, if anything, even more problematic than a filing fee. While the right to

---

**10.** *See Goldberg v. Kelly,* 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (relying on Charles A. Reich, *The New Property,* 73 Yale L.J. 733 (1964), for extension to government benefits of procedural safeguards applicable to traditional property).

a hearing may require some allegation of factual dispute, *see Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), the right to be heard in an appropriate form may not be conditioned on the quality of the claimant's evidence. The right to procedural due process is "absolute" in the sense that it does not depend on the merits of a claimant's substantive assertions, *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), or a demonstration of ultimate success. *Loudermill,* 470 U.S. at 544, 105 S.Ct. 1487; *Fuentes,* 407 U.S. at 87, 92 S.Ct. 1983 ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."). It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake. *Fuentes,* 407 U.S. at 87, 92 S.Ct. 1983.

By conditioning any right to be heard, no matter how slight, on the report of a state-certified expert, the regulatory scheme at issue here falls short, in my view, of the minimal requirements of due process for a combination of reasons. It imposes a substantial financial burden on the exercise of even the barest right to respond, and it does so, not in direct relation to the costs of process, but by conditioning the right to be heard in defense of one's property on acquiring particular evidence. As a practical matter, it may be convenient, and even cost-effective, to condition a claimant's right to defend his property interest upon his ability to produce a state-certified expert, but convenience and cost-effectiveness from the state's perspective do not, in themselves, justify imposing additional costs on the claimant. It is not difficult to envision alternate procedures, permitting the presentation of other relevant evidence, in some format and to some neutral decisionmaker, without the burdensome expense of an IME. *See, e.g., Neff v. Comm'r of the Dep't of Indus. Accidents,* 421 Mass. 70, 653 N.E.2d 556 (1995) (noting the availability of procedures under the Massachusetts workers' compensation scheme without requiring payment for an IME, including presentation, to an administrative judge, of evidence such as reports of the injury, statements of the employee and other witnesses, medical, hospital, and rehabilitation records, and other oral and written matter). Due process does not permit the deprivation of anyone's property by government action without some right to respond, even if that response involves no more than registering his objections to the taking in an appropriate way, and it is no justification that he would be entitled to the "Cadillac" of hearings if he would only pay for it.

Unlike the majority, I would not find the conditioning of a hearing upon the prepayment and filing of an IME to be valid except as applied to indigent claimants. I would hold that this limitation violates due process as applied to indigents only because it impermissibly denies a right to be heard to every workers' compensation recipient, whether indigent or not, who is unwilling to incur the additional cost of an independent medical examination. Because I would affirm, although for different reasons, the district court's judgment that the relevant provisions violate the Due Process Clause of the Fourteenth Amendment, I concur in the judgment of the court.